**S & D MECHANICAL CONTRACTORS, INC., Appellee and Cross–Appellant,**

v.

**ENTING WATER CONDITIONING SYSTEMS,
INC., Appellant and Cross–Appellee.**

[Cite as *S & D Mech. Contrs., Inc. v. Enting Water Conditioning
Sys., Inc.* (1991), 71 Ohio App.3d 228.]

Court of Appeals of Ohio,
Montgomery County.

No. 12272.

Decided March 4, 1991.

230

*Deborah C. Arnett, Cyrell E. Lynch* and *David L. Tank,* for appellee and cross-appellant.

*William C. Havemann,* for appellant and cross-appellee.

———————

WOLFF, Judge.

This case involves an appeal and a cross-appeal. Defendant-appellant and cross-appellee, Enting Water Conditioning Systems, Inc. ("Enting"), appeals from the judgment rendered in favor of plaintiff-appellee and cross–appellant, S & D Mechanical Contractors, Inc. ("S & D"), on S & D's breach of contract claim against Enting. S & D cross-appeals from the trial court's refusal to grant it certain damages to which S & D claims it is entitled as part of its compensatory damages.

S & D is a mechanical contractor which entered into a general contract on February 4, 1983, with the Veterans Administration Medical Center ("VA") to replace the boiler system at the VA's Indianapolis facility. S & D then entered into a subcontract with Enting on February 25, 1983, under which Enting was to provide all water softening and dealkalizer equipment for the VA project.

The purpose of the dealkalizer was to remove alkaline impurities, which caused the equipment to rust, from the water before it was fed to the boiler. The impurities were removed by a resin exchange process. During this process, water would flow into the dealkalizer and over a resin. The resin would then trap the alkaline materials before the water would flow into the boiler. The resin would then be flushed from the dealkalizer by a regeneration process.

As part of the general contract, the VA provided S & D with a set of written specifications which set out the requirements for the dealkalizer system. These specifications, contained in section 323 of the contract, were accompanied by a set of architect's drawings. Section 323 contained both performance requirements and system requirements. The performance requirements pertained to the dealkalizer equipment itself and required the contractor to assure that the equipment would properly function under the designated operating conditions. The system requirements related to the operating conditions under which the dealkalizer had to perform. At issue herein are two of the system requirements: one, that the dealkalizer had to be capable of delivering 28,000 gallons of water to the boiler between regenerations; two, that the system had to provide no less than seventeen cubic feet of exchange resin. The system needed at least this amount of resin in order to have the capacity to remove 20,000 grams of alkaline substance per cubic foot.

This removal rate would then enable the dealkalizer to deliver the requisite 28,000 gallons of water between regenerations.

The architect's drawings provided a floor plan of the entire VA facility, in addition to a schematic of the boiler system. That portion of the floor plan pertinent to the dealkalizer diagrammed three circles which were identified on the floor plan under the general heading of dealkalizer. There was no other information in the floor plan which related to the dealkalizer other than the general heading above the circles. Both section 323 and the architectural drawings were incorporated into the terms of Enting's subcontract.

Although the written specifications did not so require, Enting designed a two tank system. Each tank had a resin capacity of seventeen cubic feet, yielding a total resin capacity of thirty-four cubic feet. Notwithstanding the fact that Enting's system had twice the minimum resin capacity required, the system was incapable of satisfying the 28,000 gallon requirement. Enting's system was undersized by one-third. This caused the dealkalizer to regenerate every 18,000 gallons. Moreover, the dealkalizer failed to provide the minimum resin removal exchange capacity of 20,000 grams per cubic foot. It was undisputed that there was no manufactured resin on the market that could satisfy this removal requirement. In fact, there was no resin on the market that could satisfy more than two-thirds of the requirement. Thus, any dealkalizer would at least be one-third undersized with respect to this requirement. Therefore, a portion of the written specifications was faulty and incapable of being satisfied.

Because of the system's deficiencies, the VA refused to accept the system. S & D eventually contracted with Peck Water Systems to replace the system installed by Enting with a system satisfactory to the VA.

S & D sued Enting for breach of contract. The matter was heard by the referee who found in favor of Enting on the basis that the contract created a design specification which imposed responsibility for the system's shortcomings upon the VA. The referee determined that since the contract was design in nature, Enting could not be liable for the system's deficiencies which were due in part to the faulty written specifications. The referee further found that Enting had no contract liability since it had, in all other respects, substantially complied with the contract requirements which it had undertaken to meet under its subcontract with S & D.

S & D objected to the referee's report. The trial court refused to adopt the referee's report. The court found that rather than creating a design specification, the contract created a performance specification which placed the design responsibility upon S & D, and Enting, by virtue of Enting's subcontract with S & D to install the system, and not upon the VA. By so determining, the

liability for the system's deficiencies was placed on S & D vis-à-vis the VA, and on Enting vis-à-vis S & D. Accordingly, the court found for S & D, awarding it over $40,000 in damages it incurred in curing the system's deficiencies. Enting advances the following assignments of error:

"I. The referee properly concluded that the agreement between the parties more closely resembled a 'design' than a 'performance' specification. The trial court erred in finding otherwise.

"II. The trial court's assessment of $40,111.89 for damages was excessive."

In its first assignment, Enting argues that the trial court erred by construing the terms of the contract as creating a performance specification instead of a design specification, thereby making Enting liable to S & D (who was in turn liable to the VA) for the system's deficiencies. This assignment presents us with a question of whether the finding of performance specification was against the manifest weight of the evidence.

The trial court held that the determination of the type of specification called for in the contract between the VA and S & D, *i.e.*, performance or design, was critical in assessing liability for the dealkalizer's deficiencies. We agree because the characterization of the specification dictated whether S & D was obligated to the VA to produce a satisfactory system. If S & D was so obligated to the VA, S & D's subcontractor, Enting, was liable to S & D if the system it installed was unsatisfactory.

If a specification provides explicit instructions which tell the contractor exactly how the contract is to be performed and no deviation from the instructions is permissible, then the specification is design in nature. *Dewey Electronics Corp. v. United States* (Fed.Cir.1986), 803 F.2d 650, 658. If, on the other hand, the specification seeks an end result and leaves the determination as to how the result is to be obtained to the contractor, then the specification is performance in nature. *Stuyvesant Dredging Co. v. United States* (Fed.Cir.1987), 834 F.2d 1576, 1582. If a contract contains a design specification, responsibility for deficiencies rests with the party who prepared the specification because that party impliedly warrants that the specification is adequate to produce the result. *Trustees of the First Baptist Church v. McElroy* (1955), 223 Miss. 327, 334–335, 78 So.2d 138, 141. If the contract calls for a performance specification, which only indicates the desired end result, then responsibility for deficiencies lies with the contractor who designs the mechanism by which the result is to be achieved because the contractor then impliedly warrants his design's sufficiency. *Id.*

In this case, the trial court did not state why it found that the parties had, as to the system in question, entered into a performance contract rather than a design contract. In its order rejecting the referee's report, the court merely stated that after a review of the pertinent materials, it determined that the contract was a performance contract.

In examining a trial court's construction of a contract, a reviewing court cannot substitute its own judgment for the trial court's construction if the trial court's construction is sufficiently supported by the evidence. *North Coast Cookies, Inc. v. Sweet Temptations* (1984), 16 Ohio App.3d 342, 348, 16 OBR 391, 397, 476 N.E.2d 388, 394–395. Our review of the record discloses that there was competent, credible evidence which supported the trial court's construction.

For the most part, the details contained in section 323 were drafted in general terms of minimums. For example, 323–2(c) provided in part:

"* * * unit shall be delivering between regenerations, 28,000 gallons of water. *Provide no less than 17 cubic feet* on exchange resin." (Emphasis added.)

Moreover, section 323–8 which was entitled "dealkalizer system," provided in pertinent part:

"Freeboard above the surface of the resin * * * *shall be not less than 75%* of the depth of resin.

"Backwash outlet shall be at a distance above bed *equal to not less than 75%* of bed depth.

"Exchange capacity * * * shall be considered to be *minimum of 20,000 grains per cubic* foot * * * *minimum bed depth shall* be 30 inches." (Emphasis added.)

Read together, these provisions are sufficient to support the trial court's determination that the contract was performance oriented. We so conclude because the minimums do not constitute explicit instructions as to how the dealkalizer system was to be designed. Section 323 could have reasonably been read as providing the parameters within which the system was to be constructed. Of particular importance to this determination is the fact that section 323 did not state how the system was to meet the 28,000 gallon requirement. It merely set out the end result required, *i.e.*, regeneration every 28,000 gallons, and stated that seventeen cubic feet of resin was the minimum acceptable level of resin. Moreover, these sections provided no guidance as to the specifications of the dealkalizer. They stated neither how many tanks were to be installed, nor what size tanks were required. All of these details were essential components of the whole dealkalizer system. By

not including these details in section 323, the VA apparently left the design up to the contractor, or in this case, S & D's subcontractor, Enting.

The testimony of Greg Hobbs, S & D's project manager in charge of the VA project, also reasonably supports the trial court's construction of the contract. Hobbs testified as follows:

"A. The two most commonplace would be either a, uh * * * Design Specification or a Performance Specification.

"Q. And what, as you understand it, is a Design Specification?

"A. A Design Specification, uh * * * the information is contained within to allow you simply to provide and install.

"A Performance Specification will give you certain criteria so there is, uh * * * a certain amount of design build that is required.

"Q. So under a Performance Specification, who does the design work?

"A. That contractor, vendor, whoever it may be.

"Q. And under a Design Specification, who did the design work?

"A. The owner's architect/engineer.

"Q. Okay. What kind of Specifications, uh * * * would you best call Specification Three Twenty-three an example of?

"A. A Performance Specification.

"Q. Who was supposed to do the design work in that Specification? Ultimately, on the job.

"A. Ultimately on the job would have been Enting Water Conditioning."

The trial court could have reasonably relied on this testimony as evidence that the contract constituted a performance specification. Hobbs was in charge of the project and would have been in a position to know what the parties understood the contract obligations to be. Since Hobbs was a project manager, he would also be familiar with the differences between design and performance specifications.

Enting argues that the detailed drawing submitted by the architect called for two 30 × 72 inch tanks having seventeen cubic feet of resin capacity per tank. However, Enting does not indicate where in the record such requirements appear. We have examined the architect's drawing and find no reference to either a two tank system or a tank with the 30 × 72 inch dimension requirement, let alone a reference to what amounts to Enting's assertion that the drawings required thirty-four cubic feet of resin (two tanks with seventeen cubic feet each). The architect's drawings do show the three circle diagram entitled "dealkalizer system," but it provides no additional information about the tanks.

■ Enting contends that S & D's expert, Bill Watson, admitted that the drawings required a two-tank dealkalizing system with these dimensions. This contention is based on the following testimony:

"Q. Now, it's—it's drawn to scale, isn't it?

"A. A quarter-inch equals one foot.

"Q. That's correct. And up here in the upper part, are the—is the diagram of the architect/engineer * * * which is much like Enting installed, isn't it?

"A. That's correct.

"Q. Okay. And * * * does it show two tanks—dealkalization tanks about thirty inches in width?

"A. Yeah. I'd say so.

"Q. Now that's certainly an indication, from the architect/engineer that if the bidder does what was on that drawing, * * * he's gonna meet specs, isn't he?

"A. As—he would meet hardware specs.

"Q. I understand. But there's at least some indication that architect thinks that diagram and that sizing, two thirty by seventy-two inch tanks, is gonna do the trick, isn't it?

"A. I think that's a fair assumption."

We do not agree that this testimony alone is sufficient to support Enting's contention that the drawings specified two tanks with the dimensions of 30 × 72 inches. We have examined Watson's testimony. Immediately before this excerpt, Watson testified that the 30 × 72 inch dimension was one of several common dimensions and there was no single standard. He did not state that these drawings called for two tanks with these particular dimensions. We also think that because the drawings omitted so many essential details, they could have been reasonably interpreted as an indication that there was room for two tanks if two tanks were needed, and not necessarily as a requirement that two tanks had to be installed.

However, even if we were to agree that the drawings did call for two tanks, this fact alone would not necessarily make the specification a design specification. Section 323, although silent as to the specifics of the dealkalizer, contained significantly more detailed information than the drawings did. It was the province of the trial court to evaluate these materials. Section 323, as well as the testimony of Greg Hobbs and Bob Watson, was, in our judgment, sufficient to support the trial court's interpretation of the contract.

The first assignment is overruled.

Enting argues in its second assignment that the trial court's award of over $40,000 in damages to S & D was excessive. Enting claims that since the system was undersized by one-third, the reasonable cost of correction was limited to the cost of adding a third tank. It would have cost $10,000 to add an additional tank. Whether the damage award was excessive depends on whether S & D acted reasonably in replacing the entire system instead of adding one more dealkalizer tank.

After rejecting the dealkalizer, the VA hired an independent consultant, Riesz Engineering, to analyze the deficiencies and to recommend a cure. In Riesz's opinion, the system as designed was undersized by one-third. It recommended that the system's requirements could be met with the addition of a third dealkalizer tank. The VA notified S & D of Riesz's recommendation, but explicitly stated that the decision as to how to rectify the problem would be left to S & D.

S & D hired its own consultant, Peck Water Systems, to propose a solution. Peck suggested that the entire dealkalizer system be replaced with a new dual tank system, specifically rejecting Riesz's recommendation. It did so on the grounds that Peck's management would not agree to warrant another vendor's equipment that had already been cited as inadequate. This would have been the position Peck would have been in if it had simply added a third tank. Moreover, Peck did not know the contamination condition of the resin which had by this time been in use for several years. The contamination level of the resin would affect the system's capabilities. Peck also would have had to give a one-year warranty on the entire system which would have been a hybrid of Enting's and Peck's equipment, and a three-year warranty that the system would provide an exchange capacity of 20,000 grams per cubic foot of resin, as required by the original contract.

Enting did not hire a consultant. Instead, it offered to add a third tank which it would install itself.

S & D adopted Peck's proposal and, accordingly, hired Peck to replace the faulty dealkalizer system. S & D claimed its costs in replacing the faulty Enting system exceeded $56,000. This sum included the following costs: the cost of Peck's analysis to determine how to correct the deficiencies, the actual cost to replace the hardware, electrical subcontractor fees, S & D's own labor costs, overhead, interest on the retainage held by the VA, attorney fees, and S & D's lost profit.

After rejecting the referee's report, the trial court ordered separate briefs on the issue of damages. Enting argued that its maximum liability was limited to $10,000, which was the reasonable cost of correction. The court rejected this as the measure of damages on the basis that "while it [was]

possible to install a third tank, there [was] no evidence that [that] alone would produce the performance required by the specifications." The court awarded S & D over $40,000 in damages but refused to award damages for overhead, interest on retainage, attorney fees and profits.

■ It is a cardinal rule of contracts that an injured party is under a duty to mitigate its damages and may not recover those damages which it could have reasonably avoided. The duty to mitigate is limited as follows:

"The rule requiring one injured by a wrongful act or omission of another to minimize the damages resulting does not require a party to make extraordinary efforts, or to do what is unreasonable or impracticable. Ordinary and reasonable care, diligence and prudence are the measure of the duty. 16 Ohio Jurisprudence 2d 37, Damages, Section 18. The efforts of the injured party to prevent or lessen his damages include a reasonable expenditure of money as part of his damages. 16 Ohio Jurisprudence 2d 38, Damages, Section 19." *Foust v. Valleybrook Realty Co.* (1981), 4 Ohio App.3d 164, 168, 4 OBR 264, 268, 446 N.E.2d 1122, 1127.

The trial court could have reasonably found that S & D did not violate its duty to minimize its damages when it rejected Enting's solution, even though the cost of adding a third tank was significantly less expensive than the cost of the Peck system. The trial court could have reasonably determined that it would have been impracticable to adopt Enting's third-tank solution.

■ There was evidence in the form of Peck's proposal to S & D that Peck was not confident that it could rectify the system's deficiencies by the addition of another tank. The proposal stated:

"After discussion with those in engineering and management at Peck Water, it is our feeling that we would be unable to *guarantee* resolution of the issues surrounding the expected quality from the existing equipment. We are not comfortable or secure in depending on the operation of the existing equipment which would account for ⅔ of the total system if we chose to add just one more unit. The reason is because of the possible varieties of problems which could exist (i.e. resin, lining, brine tank, operator involvement, etc.)

"Consequently, we approached our recommended solution by replacing the existing equipment with a duplex system, sized to achieve the expected quality required as per the original specifications and the thru-put of approximately 14,000 gallons per unit as was discussed at the meeting conducted on January 12, 1988." (Emphasis in original.)

Since Peck would have been unable to guarantee the hybrid system, it would have been unable to satisfy the contract guarantee requirements of

section 323–5. The trial court could have thus reasonably concluded, as it appears to have done, that Enting itself could not have solved the problem by installing a third tank. Thus, the evidence reasonably supports the trial court's implicit determination that S & D acted reasonably by adopting Peck's proposal rather than Enting's.

Accordingly, the trial court's assessment of damages in the amount of $40,111.89 was not excessive. The second assignment is overruled.

S & D has brought a cross-appeal, claiming that the trial court erred as a matter of law when it refused to grant it all the compensatory damages requested.

S & D advances the following assignments of error:

"The trial court erred, as a matter of law, by denial of award of S & D's overhead costs, as damages for Enting's negligence and breach of contract.

"The trial court erred, as a matter of law, in denying S & D interest on retainage (loss of use of money), as compensation for Enting's negligence and breach.

"The trial court erred, as a matter of law, in denying S & D attorney fees as costs and compensatory damages for Enting's negligence, breach of contract and breach of warranty.

"The trial court's decision denying lost profits to S & D was against the manifest weight of the evidence."

 The disposition of this cross-appeal is governed by the contract principle that a party injured by virtue of a breach of contract is entitled to be compensated for the injury sustained, including the right to be placed in the same position it would have been in had the breach not occurred.

We do not think that the damages as awarded were sufficient to place S & D in the position it would have been in had Enting not breached its contract. The trial court gave no rationale for holding that S & D was not entitled to recover the overhead costs, interest on retainage, attorney fees, and lost profits. In our view, S & D was entitled to recover for all these items, except lost profits.

 In its first assignment, S & D claims it is entitled to recover overhead costs it incurred by virtue of Enting's breach. As part of its compensatory damages, a party injured by a breach of contract is entitled to recover indirect costs incurred as a result of the breach. One such indirect cost is an overhead expense. S & D argues it incurred $4,893 in overhead expenses when S & D had to divert its own time and resources from other projects to correct the deficiencies created by Enting's breach. The sum alleged represents an

overhead expense of 12.1 percent of S & D's direct costs, other than legal expenses, in correcting the defective Enting system. Both S & D's expert Bob Watson and Dan Enting, the president of Enting, testified that a 12.1 percent overhead figure was reasonable in the industry. Enting went so far as to say a fifteen percent overhead expense was reasonable.

Various Ohio courts have held that indirect overhead costs are recoverable. *Warren Tel. Co. v. Hakala* (1957), 105 Ohio App. 459, 6 O.O.2d 201, 152 N.E.2d 718. The Hamilton County Municipal Court has explained the rationale for this recovery:

" * * * [M]erely because the Plaintiff utilized materials and services within its own corporate structure, it does not follow that such services and materials are without value, or have a lesser value than if supplied by an outside independent contractor. Assuredly it is not this court's intention, nor the intention of the law in Ohio to eliminate overhead expenses and profit from repairmen engaged in repairing damage occasioned by the wrongful conduct of a third party." *Cincinnati Bell, Inc. v. Hinterlong* (1981), 70 Ohio Misc. 38, 44, 24 O.O.3d 52, 56, 437 N.E.2d 11, 15.

The $4,893 sum alleged represents a value lost by S & D by virtue of Enting's breach. There was competent testimony to support the determination that 12.1 percent was a reasonable overhead expense. S & D is entitled to recover this amount and, therefore, the trial court erred when it excluded this amount from the damage award.

The first assignment is sustained.

In its second assignment, S & D argues that it was entitled to recover the interest which accrued on the retainage withheld by the VA.

S & D contends that it is entitled to recover $2,101.20 of interest that accrued while the VA withheld the retainage from June 26, 1986 until December 24, 1988. S & D computed the interest applying an interest rate of eight percent which was the lowest short-term lending rate available during the withholding period.

In an action for breach of contract, damages based on interest are generally recoverable. *Champion Ice Mfg. & Cold Storage v. Penn. Iron Works Co.* (1903), 68 Ohio St. 229, 67 N.E. 486. Interest is especially recoverable when the breach consists of failure to pay money because the interest actually represents the value lost on the use of the money. *Id.* at 234, 67 N.E. at 234. In this case, the $10,500 retainage withheld by the VA was money due to S & D under the terms of the general contract. It was withheld because of Enting's breach of its subcontract with S & D, which prevented S & D from fully performing its contract with the VA. But for Enting's breach,

the VA would not have withheld retainage. Since the VA withheld this money for almost two years, S & D lost the use of this money for this period. The $2,101.20 represents the market value of S & D's monies during the period it was withheld. S & D is entitled to recoup the value it lost.

The second assignment is sustained.

In its third assignment, S & D contends it is entitled to recover $4,236.96 for attorney fees it incurred in connection with the VA's demands for S & D to correct the dealkalizer's deficiencies caused by Enting's breach. The evidence disclosed that these fees were attributable to the costs of legal negotiations with the VA wherein the parties sought to resolve the problems connected with the dealkalizer system. With the exception of two bills dated November 1988, which concerned a final settlement between the VA and S & D on the water softener, all of these legal fees were generated between July 1987 through April 1988. This period pre-dates the commencement of the action against Enting.

Generally, each party to an action is responsible for its own attorney fees incurred as a result of the litigation. *Cincinnati Ins. Co. v. Diebold* (1989), 64 Ohio App.3d 273, 581 N.E.2d 566. However, this general rule, known as the "American Rule," does not operate to preclude such recovery in all circumstances. Attorney fees may be recovered:

" * * * [W]here the wrongful act of the defendant has involved the plaintiff in litigation with others or placed him in such relation with others as makes it necessary to incur expense to protect his interest, such costs and expenses, including attorneys' fees, should be treated as the legal consequences of the original wrongful act and may be recovered as damages." *V.N. Holderman & Sons. Co. v. Jackson* (Ct.Cl.1975), 73 O.O.2d 148, 150.

In our view, this case does not require the application of the American Rule. S & D does not seek to recover those attorney fees it incurred by virtue of its litigation against Enting. Rather, S & D seeks to recover those attorney fees it incurred as a result of responding to the VA's demands that S & D correct the problems caused by Enting's breach. Therefore, the legal fees incurred in the third-party litigation against the VA are attributable to, and are the legal consequence of, Enting's wrongful breach. They are thus recoverable as compensatory damages.

The third assignment is sustained.

Finally, S & D argues that it is entitled to recover profits of $4,956.43, which it alleges were lost by virtue of Enting's breach. Essentially, S & D argues that it is entitled to profits from other productive work that it lost when it was required to divert its own resources to correct the problem

created by Enting. Its claim of $4,956.43 for lost profits represents ten percent of all of its other claimed damages except the interest on the retainage withheld by the VA.

We are unpersuaded by this argument. S & D was entitled to recover overhead, interest, and attorney fees because these sums would make it whole. Such is not the case with the lost profits *alleged.* An anticipated profit margin of ten percent was built into the prime contract between S & D and the VA. S & D was eventually paid in full by the VA, which payment included the built-in profit margin of ten percent. The trial court awarded S & D over $40,000. This sum included the actual cost of the Watson Analysis to determine how to correct the problem, the equipment installed by Peck, electrical subcontractor costs, and "S & D direct labor, material, and equipment rental."

Although we agree with S & D that it is entitled to lost overhead because its own resources were diverted to correct the problem, this is not the case with lost profits. S & D was able to demonstrate with some certainty that its own resources were diverted to correct the Enting system, and an overhead figure based on industry standards is appropriate. S & D has not demonstrated with sufficient certainty that it would have had additional profit from other work had it not been required to redo the system. Thus, ten percent of the cost of redoing the system would have been speculative, even though ten percent of the cost of a job might comport with recognized industry-wide profit margins. *Gahanna v. Eastgage Properties, Inc.* (1988), 36 Ohio St.3d 65, 521 N.E.2d 814. Parenthetically, we also note that even if a case for lost profits had been made, S & D's attorney fees and overhead should not have been part of the sum to be multiplied by the ten percent profit figure.

The fourth assignment is overruled.

Based on the foregoing analysis, the judgment of the trial court will be affirmed, except to the extent it does not provide for S & D's damages on account of overhead, interest on retainage, and attorney fees. The matter will be remanded for inclusion of these damages in the award to S & D.

*Judgment affirmed as modified*
*and cause remanded.*

WILSON and BROGAN, JJ., concur.