**DISCOVER BANK**

v.

**OWENS.**

2004-Ohio-7333.]

Cleveland Municipal Court, Ohio.

No. 2003 CVF 20195.

Decided Sept. 9, 2004.

Thomas & Thomas and Charles Tate, for plaintiff.

**74**

Ruth M. Owens, pro se.

———————

ROBERT J. TRIOZZI, Judge.

{¶ 1} This case concerns a complaint for breach of contract. Plaintiff, Discover Bank, a lender and issuer of credit cards, alleges that defendant used a Discover card provided by plaintiff to purchase goods or services, or to receive cash advances, and has breached the parties' agreement by failing to make minimum monthly payments required under the cardholder agreement. Discover claims that there is now a $5,564.28 balance due on the account, and because of defendant's failure to make payments, plaintiff contends that it is entitled to judgment against defendant for the entire amount due.

{¶ 2} Representing herself, defendant Ruth M. Owens, in her answer to plaintiff's complaint, revealed that she had joined the growing number of Americans who perhaps due to reasons of disability, declining real wages, job displacement, and/or rising health-care costs, had found themselves overwhelmed by accumulated credit-card debt. As a result, Owens became one of several thousand Clevelanders annually who, as the result of ballooning credit-card debt, become the subject of a credit-card collection case in this court. In her handwritten answer to the plaintiff's complaint, Owens wrote:

> I would like to inform you that I have no money to make payments. I am on Social Security Disability. After paying my monthly utilities, there is no money left except little food money and sometimes it isn't enough. If my situation was different I would pay. I just don't have it. I'm sorry.

{¶ 3} In seeking to establish the validity of its case against Owens, plaintiff provided the court with a copy of a "Cardmember Agreement," which sets forth the agreement terms for the Discover card issued to Owens. The agreement outlines, among other things, the minimum monthly payment requirement, the periodic finance charges, and the various fees that ultimately were applicable in this case: the late fee and the over-limit fee. In its complaint, plaintiff further provided a copy of the Discover Card Account Summary, which showed an unpaid balance for Owens's account of $5,564.28.

{¶ 4} At the pretrial conference held by the court, Owens asserted that she had made her best effort to pay but that her financial circumstances prevented her from making any further payments on her account. Although she did not dispute the documentation showing the unpaid balance, Owens indicated that she had in fact made many payments over several years and wanted to make sure that they were properly credited. The matter was set for trial so that plaintiff could present copies of defendant's payment history to prove that the $5,564.28 balance was accurate.

{¶ 5} At trial, plaintiff did present the entire history of defendant's monthly Discover card statements from January 1996 through May 2003, when defendant's account was sent for collection.

{¶ 6} That evidence revealed that in January 1996 Owens received her Discover card statement, which showed a new balance of $1,460.73. The statement further reflected that her credit limit was set at $1,900. Owens had not used the credit card the previous month, but had incurred monthly finance charges. Additionally, her account was debited $10.34 for a Discover card product called CreditSafe Plus, which evidently would put her payments and finance charges on hold without affecting her credit rating should she become unemployed, hospitalized, or disabled. Presumably, since Owens was on Social Security Disability and already unemployed, the CreditSafe product pertained only to the eventuality of her becoming hospitalized. The January 1996 statement further reflected a timely payment on her account.

{¶ 7} From January 1996 to March 1997, Owens did not make any purchases on her Discover card. She continued to incur monthly debits for the CreditSafe Plus product and continued to incur monthly finance charges on the balance due on the account. During this time period, Owens did make payments on her account, but on several occasions (as set forth in the credit card agreement) she incurred additional fees for being late with her payments.

{¶ 8} On March 27, 1997, Owens used her card for the last time, taking a $300 cash advance from Sears. With that transaction, her April 1997 statement showed that she now had a new balance of $1,895.53.

{¶ 9} In May 1997 Owens made another payment; however, it was less than the minimum payment due. As a result she incurred another late-payment fee. Without making any purchases or taking any further cash advances, but with the accrual of monthly finances charges, Owens's balance now rose to $1,962.82. Because these additional charges had now put her over her credit limit, Owens incurred an additional $20 over-limit fee.

{¶ 10} Over the next six years Owens continued to make payments on her account, but because of finance charges and fees her balance was never again to be under her credit limit of $1,900. Despite never using her credit card again, Owens was charged a monthly over-limit fee ranging from $20 to $29 per month. From May 1997 to May 2003, Owens was assessed a total of $1,518 in over-limit fees.

{¶ 11} During this time period, despite the growing record of payment difficulties, Discover also continued to debit Owens's account for its CreditSafe Plus product. From May 1997 to May 1999, Owens was charged a total of $369.52 for

a product which, despite her being on Social Security Disability, evidently did not apply to her credit predicament.

{¶ 12} During this six-year period, Owens continued to attempt to meet her obligation and did make numerous payments. From May 1997 to May 2003 Owens paid Discover a total of $3,492. Since many of the payments were below the minimum monthly payment required and because other monthly payments were in fact not timely made, Owens further was assessed numerous late-payment fees, which over the six-year period totaled $1,160.

{¶ 13} In short, despite never using the credit card again and having paid $3,492 on a $1,900 debt, with all the fees and accrued finance charges, Owens was nevertheless faced with a $5,564.28 balance still owing on the account.

{¶ 14} How does something like this happen? Had Owens simply stopped paying on her account in May 1997, as perhaps some unscrupulous person might have considered, her account would have been closed and charged off at approximately $2,000, an amount that Discover would have sought to collect at the court seven years ago. If common practice at the court is any indicator at all, Discover might have readily agreed to negotiate a settlement at a small fraction of the amount due. Discover perhaps would have been surprised, but most likely content, to collect the entire amount, but most certainly it would never have anticipated collecting nearly 75 percent over what was owed in the first place.

{¶ 15} But because Owens was not unscrupulous and evidently did her absolute best despite being on Social Security Disability, she found herself in debt so deeply that she ultimately came to the sad conclusion that it was a debt out from under which she could never climb. The court does not have before it the records prior to January 1996 to know just what Owens may have purchased for a few hundred dollars using her Discover card. Whatever it was it certainly cannot have been worth the thousands of dollars she actually paid, and most certainly was not worth the additional thousands of dollars still expected today by Discover.

{¶ 16} No doubt some of the responsibility for this situation rests with Owens. It might have been unfair for a creditor to extend easy credit at stiff terms to someone who clearly was in a difficult financial predicament in the first place, but no one forced Owens to open the account and accept the card in the first place, and certainly no one forced her to use it, despite its allure for easy access to money in difficult financial times. Owens might have sought financial or legal counsel several years ago to work out some suitable arrangement with Discover, yet her instincts were always that she wanted to plug away at meeting her financial obligations. While clearly placing her on the moral high road, that same highway unfortunately was her road to financial ruin.

{¶ 17} How is it that the person who wants to do right ends up so worse off? It is plain to the court that the creditor also bears some responsibility. Discover kept Owens's account open and active long after it was painfully obvious that she was never going to be able to make payments at the expected level. Under the law, an injured party has a duty to mitigate his damages and may not recover those damages that he could reasonably have avoided. *S & D Mech. Contrs., Inc. v. Enting Water Conditioning Sys., Inc.* (1991), 71 Ohio App.3d 228, 593 N.E.2d 354; *Geis v. Zylka* (1995), 70 Ohio Misc.2d 28, 650 N.E.2d 211. A contract may be held unenforceable when a creditor leaves a debtor with little disposable income and presses a demand for judgment despite being aware of the debtor's dire financial straits. *City Fin. Services v. Smith* (Jan. 4, 2000), Cleveland M.C. No. 97 CVF 00679, 2000 WL 288469. Even if plaintiff was technically within its rights in its handling of defendant's account, it was unreasonable and unjust for it to allow defendant's debt to continue to accumulate well after it had become clear that defendant would be unable to pay it. Unjust enrichment occurs when one retains money or benefits that, in justice and equity, belong to another. *Hummel v. Hummel* (1938), 133 Ohio St. 520, 528, 11 O.O. 221, 14 N.E.2d 923; *Seward v. Mentrup* (1993), 87 Ohio App.3d 601, 603, 622 N.E.2d 756. Because of its failure to even minimally pay attention to Owens's circumstances, and for allowing the debt to accumulate unchecked, the court finds that Discover would be unjustly enriched if this court were now to grant judgment in its favor.

{¶ 18} The court further finds the repeated six-year accumulation of over-limit fees to be manifestly unconscionable. A determination of unconscionability is to be made in light of a variety of factors, including "the sheer harshness of contractual terms together with unequal bargaining positions which renders certain consumer contracts suspect and worthy of judicial revision." *Orlett v. Suburban Propane* (1989), 54 Ohio App.3d 127, 561 N.E.2d 1066. Unconscionability "has generally been recognized to include an absence of meaningful choice on the part of one of the parties, together with contract terms which are unreasonably favorable to the other party. Whether a meaningful choice is present in a particular case can only be determined by consideration of all the circumstances surrounding the transaction. In many cases the meaningfulness of the choice is negated by a gross inequality of bargaining power." *Williams v. Walker–Thomas Furniture Co.* (1965), 350 F.2d 445, 449. See, also, *Cty. Asphalt, Inc. v. Lewis Welding & Eng. Corp.* (1970), 323 F.Supp. 1300; *Vanyo v. Clear Channel Worldwide,* 156 Ohio App.3d 706, 2004-Ohio-1793, 808 N.E.2d 482 ¶17; *Evans v. Graham Ford, Inc.* (1981), 2 Ohio App.3d 435, 2 OBR 529, 442 N.E.2d 777.

{¶ 19} After reviewing the cardmember agreement that plaintiff contends was applicable in this case, it is clear that the operation of its terms as it applied to Owens was unconscionable. This was not a case where Owens recklessly used her credit card to purchase items beyond the agreed-upon credit limit. After the fees and finance charges put her balance over the $1,900 credit limit, Owens never used the credit card again. Sixty months later, however, Discover continued to charge Owens a $29 monthly fee, despite the fact that she had made payments nearly twice the $1,900 she owed in the first place. The court further questions the CreditSafe fees consistently charged to Owens's account. At what point in the life of an unemployed, disabled, impoverished person was such a product ever designed to be used?

{¶ 20} The Cleveland Municipal Court has authority in the cases before it "to hear and determine *all legal and equitable remedies* necessary or proper for a complete determination of the rights of the parties." (Emphasis added.) R.C. 1901.13(B). See, also, *Behrle v. Beam* (1983), 6 Ohio St.3d 41, 6 OBR 61, 451 N.E.2d 237; *Natl. City Bank v. Fleming* (1981), 2 Ohio App.3d 50, 2 OBR 57, 440 N.E.2d 590; *Bound v. Biscotti* (1995), 76 Ohio Misc.2d 6, 663 N.E.2d 1376. The function of equity is to supplement the law where it is insufficient, moderating the unjust results that would follow from the unbending application of the law. *Salem Iron Co. v. Hyland* (1906), 74 Ohio St. 160, 77 N.E. 751. The chief characteristic of a court of equity is adequate power to afford full relief to the parties before it. *Brinkerhoff v. Smith* (1897), 57 Ohio St. 610, 49 N.E. 1025; *Cookston v. Box* (1957), 5 O.O.2d 102, 146 N.E.2d 171, reversed on other grounds (1959), 109 Ohio App. 531, 12 O.O.2d 150, 160 N.E.2d 327. A court of equity is a court of conscience that must apply rules of reason and righteousness, within the rules of equity applicable to the case before it. Id. The various revisions to Ohio's laws since statehood have not brought about any change in the scope of its courts' equity jurisdiction. 41 Ohio Jurisprudence 3d (1998), Equity, Section 3.

{¶ 21} Equity may be invoked to prevent injustice or unfairness. Courts of equity will assist the wronged party on the ground of fraud, imposition, or unconscionable advantage if there has been great inequality in the bargain. *Wagner v. Hummel* (1937), 25 Ohio L.Abs. 400, 1937 WL 2359. To prevent a court of equity from exercising jurisdiction, it is not enough that there be a remedy at law; the remedy itself must be plain, adequate, and complete. *Salem Iron Co. v. Hyland* (1906), 74 Ohio St. 160, 77 N.E. 751; *Gannon v. Perk* (1975), 47 Ohio App.2d 125, 1 O.O.3d 233, 352 N.E.2d 606, reversed in part and affirmed in part on other grounds (1976), 46 Ohio St.2d 301, 75 O.O.2d 358, 348 N.E.2d 342. An adequate remedy at law is one that affords relief with reference to the matter in controversy and is appropriate to the particular circumstances of the case. *Mt. Vernon v. Berman & Reed* (1919), 100 Ohio St. 1, 125 N.E. 116; *Brissel v.*

*State* (1912), 87 Ohio St. 154, 100 N.E. 348. Defendant has no such remedy at law, so the exercise of this court's equitable jurisdiction is both necessary and proper.

{¶ 22} Where equitable jurisdiction has once been asserted in a given field because of the absence or inadequacy of legal remedy, it will not be ousted by any subsequent change in the law that creates an adequate legal remedy or makes adequate an existing, but previously incomplete, legal remedy. *Townsend v. Carpenter* (1841), 11 Ohio 21, 1841 WL 42; *Cram v. Green* (1834), 6 Ohio 429, 1834 WL 31. Equity abhors penalties, such as an agreement to pay an arbitrarily fixed sum of money for failing to exactly perform some condition of a contract. *Peppe v. Knoepp* (1956), 103 Ohio App. 223, 3 O.O.2d 281, 140 N.E.2d 26; *Berg v. Devore* (1953), 141 N.E.2d 481, 74 Ohio L. Abs. 447. The over-limit and late fees repeatedly piled on by plaintiff in this case over a seven-year period are just such penalties.

{¶ 23} An equity court exercises a broad and flexible jurisdiction to grant remedial relief where justice or good conscience requires it. *Bldg. Serv. & Maint. Union Local 47 v. St. Lukes Hosp.* (1967), 11 Ohio Misc. 218, 40 O.O.2d 500, 227 N.E.2d 265. Equity courts are not bound by formula, or restrained by any limitation that tends to trammel the free and just exercise of judicial discretion. *Keystone Driller Co. v. Gen. Excavator Co.* (1933), 290 U.S. 240, 54 S.Ct. 146, 78 L.Ed. 293. Equity is able to adapt to new conditions and novel facts, allowing it to act in the role of a social reformer. *Oliver v. Pray* (1829), 4 Ohio 175, 1829 WL 26; *Phillips v. Graves* (1870), 20 Ohio St. 371, 1870 WL 46.

{¶ 24} This court is all too aware of the widespread financial exploitation of the urban poor by overbearing credit-card companies. Defendant has clearly been the victim of plaintiff's unreasonable, unconscionable, and unjust business practices. Equity allows no wrong to be without a remedy. *Columbus Packing Co. v. State* (1919), 100 Ohio St. 285, 126 N.E. 291. This court has broad legal and equitable powers, and now brings them to bear for the debtor in this case. The appropriate remedy is clear:

Judgment for defendant.