OPINION
{¶ 1} Defendant-appellants Samuel Schindler and Steve Hemsath (hereinafter "Schindler" and "Hemsath," respectively) appeal from a decision of the Montgomery County Court of Common Pleas in which summary judgment was granted in favor of plaintiff-appellee Audiovox Corporation (hereinafter "Audiovox"). Hemsath also appeals from the decision of the trial court dismissing his complaint against third-party defendant-appellee Larry Walton (hereinafter "Walton"). In light of the procedural complexity of the case before us, each appellant's assignments of error will be addressed on an individual basis.
 {¶ 2} In his sole assignment of error, Schindler contends that the trial court erred when it granted summary judgment to Audiovox finding that no genuine issue of material fact existed with respect to whether Audiovox had a duty to mitigate its damages subsequent to an alleged breach of contract by defendant Dayton Comtec, Inc., d/b/a Factory Direct Outlet (hereinafter "Factory Direct"), a business previously owned by Schindler. Schindler's liability in this matter is premised on the fact that he executed and delivered to Audiovox an Individual Guaranty Contract, wherein Schindler agreed to guarantee the "prompt full payment" of all sums due Audiovox by Factory Direct. Schindler asserts that because Audiovox was aware that Factory Direct continually failed to make payments in a timely manner, Audiovox had a duty to mitigate its damages by stopping shipment of goods to Factory Direct, thereby avoiding any further loss.
 {¶ 3} Hemsath advances three assignments of error. In his first assignment, Hemsath contends that the trial court erred when it granted summary judgment to Audiovox against Schindler. Hemsath argues that the individual guaranty executed by Schindler was made to a different corporate entity than the one currently asserting claims against Schindler. Specifically, Hemsath contends that Schindler did not execute the guaranty in favor of Audiovox Corporation as it presently exists. Rather, Schindler executed the guaranty in favor of Audiovox Midwest Corporation. Hemsath argues that material issues exist as to whether Audiovox is the successor in interest to Audiovox Midwest Corporation, and thus, whether Audiovox has a valid interest in the personal guarantee executed by Schindler.
 {¶ 4} In his second assignment, Hemsath contends that the trial court erred when it granted summary judgment to Schindler with respect to his claims against Hemsath for indemnification and breach of contract. On February 17, 1987, Schindler sold his interest in Factory Direct to Hemsath and third-party defendant Thomas N. Schindler. Pursuant to certain terms for the sale of the corporation, Schindler requested that Hemsath and Tom Schindler execute an agreement whereby Schindler would be released from any debts or liabilities associated with Factory Direct. Hemsath argues that a genuine issue of material fact exists with respect to whether the release he signed requires that he indemnify Schindler for the full amount of the sums owed by Factory Direct to Audiovox.
 {¶ 5} Lastly, Hemsath contends that the trial court erred when it dismissed his complaint against defendant-appellee Larry Walton. On May 26, 1993, Hemsath sold his interest in Factory Direct to a group of businessmen including Larry Walton. Hemsath argues that Walton and the others executed a sales agreement with Hemsath that required them to indemnify him "against any and all liabilities, losses, damages, claims, suits, judgments, costs and expenses" associated with Factory Direct. Thus, Hemsath contends that Walton, not he, is liable for the sums owed by Factory Direct to Audiovox.
 {¶ 6} For the following reasons, the judgment of the trial court will be affirmed.
 I {¶ 7} On March 20, 1985, Schindler executed an individual guaranty in favor of Audiovox in which he guaranteed the payment of any claims of Audiovox against Factory Direct. At the time the guaranty was executed, Schindler was a stockholder of Factory Direct.
 {¶ 8} Schindler sold his stock in Factory Direct to Hemsath and Tom Schindler on February 17, 1987. As part of the sale of stock, Hemsath and Tom Schindler signed a "Purchase Agreement" and a "Release" in order to complete the sale. The "Purchase Agreement" states in pertinent part:
 {¶ 9} "Purchasers shall sign the necessary agreements to release Samuel K. Schindler from any and all liabilities and shall hold [him] harmless from the date of closing. . . . Purchasers shall accept all liabilities with all vendors at the time of closing and shall obtain a release of liability from all vendors of Samuel K. Schindler within 60 days of closing."
 {¶ 10} The "Release" provides in pertinent part that:
 {¶ 11} "the undersigned hereby release Samuel K. Schindler from all claims and demands in any way connected with Dayton Comtec, Inc. or in any way out of its business or financial affairs and the undersigned agree to hold the said Samuel K. Schindler harmless from any and all such claims excepting however any taxes or other payable not shown on the January, 1987 financial statement for said corporation and which is in excess of $7,500.00."
 {¶ 12} On March 26, 1993, Hemsath sold his interest in Factory Direct to Larry Walton, John Dalton, Jordan DeHaven, and Patrick Meek. Walton alleges that, unlike the "Purchase Agreement" and "Release" executed by Hemsath and Tom Schindler in favor of Schindler, neither he nor any of his business partners entered into any similar type of agreement with Hemsath. Walton also contends that he was never made aware of the original guaranty executed by Schindler in favor of Audiovox.
 {¶ 13} In September, 1999, Factory Direct became insolvent and terminated its operations. It is undisputed that when Factory Direct closed its doors for good, it owed Audiovox $53,159.28 in unpaid balances. This unpaid sum forms the basis of Audiovox's complaint against Factory Direct and Schindler.
 {¶ 14} Audiovox obtained a default judgment against Factory Direct on December 5, 2000. Thereafter, Audiovox filed a motion for summary judgment against Schindler which the trial court denied on May 18, 2001. The case was then sent down to the magistrate for further proceedings. On December 10, 2002, the magistrate issued a decision granting both Audiovox and Schindler summary judgment as to their claims. In her decision, the magistrate held that in light of the personal guarantee executed by Schindler, he was liable for the entire sum Audiovox claimed that it was owed. The magistrate also determined that because of certain language in the "Release" signed by Hemsath and Tom Schindler, Hemsath was liable to Schindler for the sum of $7,500.00.
 {¶ 15} Both Schindler and Hemsath filed timely objections to the magistrate's decision, and on October 1, 2003, the trial court issued the instant decision sustaining in part and overruling in part the objections filed by Schindler while overruling Hemsath's objections in their entirety. The trial court concluded that Audiovox had no duty to mitigate its damages until Factory Direct suspended payments in 1999. The court also held that Hemsath was liable for the full amount of any judgment against Schindler with respect the sums owed to Audiovox by Factory Direct.
 {¶ 16} It is from this judgment that Schindler and Hemsath now appeal.
 II {¶ 17} Schindler's sole assignment is as follows:
 {¶ 18} "The trial court erred by granting audiovox's supplemental motion for summary judgment."
 {¶ 19} In his single assignment of error, Schindler contends that the trial court erred when it granted Audiovox's motion for summary judgment. Schindler argues that he submitted evidence sufficient to overcome summary judgment with respect to Audiovox's failure to mitigate its damages when Factory Direct allegedly breached its contract by making untimely payments under the sales contract.
 {¶ 20} Civ. R. 56 sets forth the standard for summary judgment. When ruling on a summary judgment motion, the evidence is to be construed most strongly in favor of the nonmoving party. Summary judgment is not proper unless it appears from the evidence that reasonable minds could come to but one conclusion and that conclusion being one against the nonmoving party. The Supreme Court has held that the party seeking summary judgment must specifically delineate the basis upon which summary judgment is sought so that the opposing party has a meaningful opportunity to respond. Mitseff v. Wheeler (1988), 38 Ohio St.3d 112, 526 N.E.2d 798, syllabus.
 {¶ 21} A reciprocal burden of specificity applies to the nonmoving party. Id. When a proper summary judgment motion is made, the nonmoving party must produce evidence of specific facts which establish the existence of an issue of material fact. Id. The nonmoving party is responsible for producing evidence on the issues for which it bears the burden of production at trial. Wing v. Anchor Media, Ltd. Of Texas
(1991), 59 Ohio St.3d 108, 570 N.E.2d 1095.
 {¶ 22} We consider an appeal from summary judgment under a de novo standard of review. Grafton v. Ohio Edison Co. (1996), 77 Ohio St.3d 102,105, 671 N.E.2d 241.
 {¶ 23} "Under the common law of contracts, mitigation is a fundamental tenet of a damage calculus." Frenchtown Square Partnership v. Lemstone,Inc. (2003), 99 Ohio St.3d 254, 791 N.E.2d 417. Contracts are the mutual exchange of promises, with each party holding an expectation of certain obligations and benefits. Id. Thus, contract law acknowledges that mitigation, otherwise known as the doctrine of avoidable consequences, may justly place an injured party "in as good a position had the contract not been breached at the least cost to the defaulting party." Id., quoting F. Ent., Inc. v. Kentucky Fried Chicken Corp. (1976),47 Ohio St.2d 154, 159-160, 351 N.E.2d 121.
 {¶ 24} In S D Mechanical Contrs., Inc. v. Enting Water ConditioningSys., Inc. (1991), 71 Ohio App.3d 228, 593 N.E.2d 354, this court noted the "cardinal rule of contracts that an injured party is under a duty to mitigate its damages and may not recover those damages which it could have reasonably avoided." Id. at 238, 593 N.E.2d at 361. In that case, we also noted a limitation on the duty to mitigate, in that a party is not required to "`make extraordinary efforts, or to do what is unreasonable or impracticable. Ordinary and reasonable care, diligence and prudence are the measure of the duty.'" Id., quoting Foust v. Valleybrook RealtyCo. (1981), 4 Ohio App.3d 164, 168, 446 N.E.2d 1122, 1127. As the trial court correctly noted, whether Audiovox had a duty to mitigate its damages from Factory Direct's failure to tender timely payment[s] depends on at what point the contract between the parties was breached.
 {¶ 25} R.C. § 1302.11 addresses the course of performance or practical construction of a sales contract and provides:
 {¶ 26} "(A) Where the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any courseof performance accepted or acquiesced in without objection shall berelevant to determine the meaning of the agreement. (Emphasis added).
 {¶ 27} "(B) The express terms of the agreement and any such course of performance, as well as any course of dealing and usage of trade, shall be construed whenever reasonable as consistent with each other; but when such construction is unreasonable, express terms shall control course of performance and course of performance shall control both course of dealing and usage of trade.
 {¶ 28} "(C) Subject to provisions of section 1302.12 of the Revised Code, such course of performance shall be relevant to show a waiver or modification of any term inconsistent with such course of performance."
 {¶ 29} Schindler points out that the invoices attached to the original complaint required that Factory Direct tender payment to Audiovox within sixty (60) days from the date of the invoice. Audiovox does not dispute that on numerous occasions, Factory Direct made payments beyond the 60 day contract terms and that said payments were accepted late. Schindler asserts that Audiovox could have avoided the loss it now claims had it ceased shipping goods to Factory Direct when Audiovox became aware of their inability to pay in a timely manner.
 {¶ 30} In Conklin v. Dan's Auto Sales (May 22, 1997), Licking App. No. 96CA00165, the buyer of a motor vehicle made four late payments which the creditor accepted. The creditor then repossessed the vehicle. The Fifth District Court of Appeals affirmed the decision of the trial court which held that a creditor's routine acceptance of late payments from a buyer renders the payments non-delinquent. The buyer's payments on the purchase contract were timely such that the creditor did not have the right to repossess the truck.
 {¶ 31} After a thorough review of the record in this matter, we agree with the reasoning of the trial court and the court in Conklin. The contract between Audiovox and Factory Direct was modified through an established course of dealing. During 1998 and 1999, Audiovox clearly established a habit of accepting late payments from Factory Direct. Thus, "the routine acceptance of late payments by Audiovox effectively made the payments non-delinquent." Accordingly, the sales contract was not breached until Factory Direct stopped making payments in July, 1999, and Audiovox was under no duty to mitigate its damages until such time as it did when it ceased shipping goods to Factory Direct.
 {¶ 32} From our review of the record, we conclude that the trial court properly decided, construing the evidence most strongly in Schindler's favor, that no genuine issue of material fact existed and that reasonable minds could come to but one conclusion, that being adverse to Schindler.
 {¶ 33} Schindler's sole assignment of error is overruled.
 II {¶ 34} Hemsath's first assignment is as follows:
 {¶ 35} "The trial court erred in granting summary judgment to audiovox corporation against samuel schindler."
 {¶ 36} In his first assignment of error, Hemsath contends Schindler's claim against him is without merit because the claim of Audiovox against Schindler is invalid. Hemsath asserts that the entity, Audiovox Midwest Corp., in whose favor Schindler executed the Individual Guaranty in 1985 ceased to exist in March, 1992, when it merged, becoming Audiovox Corporation. Thus, Hemsath argues that terms of the sales contract with Factory Direct for which Schindler had provided his personal guaranty had been materially changed without his consent, and Schindler's guaranty was invalid at the time Factory Direct breached the agreement in 1999.
 {¶ 37} A guaranty is a promise by one person to pay the debts of another. 52 Ohio Jurisprudence 3d (1997) 238, Guaranty and Suretyship,
Section 2. Further defined, a contract of guaranty is:
 {¶ 38} "[a] collateral engagement for the performance of the undertaking of another, and it imports the existence of two different and distinct obligations — one being that of the principal debtor and the other that of the guarantor. The obligation of a guarantor is collateral and secondary to the obligation of the principal debtor."
 {¶ 39} "The principal debtor is not a party to the guaranty, and the guarantor is not a party to the principal obligation. The undertaking of the former is independent of the promise of the latter; and the responsibilities which are imposed by the contract of guaranty differ from those which are created by the contract to which the guaranty is collateral." 52 Ohio Jurisprudence 3d (1997) 239-240, Guaranty andSuretyship, Section 3. See, also, Madison Nat'l. Bank v. Weber (1927),117 Ohio St. 290, 293, 158 N.E. 543.
 {¶ 40} It is undisputed that on March 20, 1985, Schindler executed an unconditional guaranty in which he agreed to be personally responsible for the "prompt full payment when due of every claim of Audiovox which now exists and which may hereafter arise in favor of Audiovox as against customer [Factory Direct]." Additionally, the guaranty included a provision that specifically stated that it "it shall bind the undersigned [Schindler], his legal representatives and assigns and inure to Audiovox, its successors and assigns."
 {¶ 41} On February 25, 1992, Audiovox Midwest Corporation merged "with and into" Audiovox Corporation, as evidenced by the "Joint Plan and Agreement of Merger." The magistrate had this document before her when she held that Audiovox, as it presently exists, was entitled to enforce Schindler's guaranty. This document provides in pertinent part:
 {¶ 42} "1. Upon the effectiveness of the merger the separate existence of MIDWEST shall cease and be extinguished and AUDIOVOX (hereinafter) sometimes referred to as the `Surviving Corporation' shall survive such merger and continue to exist under and be governed by the laws of Delaware and shall have the name AUDIOVOX CORPORATION.
 {¶ 43} "2. All of the property of MIDWEST, real, personal and mixed,tangible and intangible, including real estate, plants and equipment, furniture and fixtures, cash, accounts receivable, notes receivable,choses in action, going concern value, corporate name and good will, and any other assets of any character or description of which it may be possessed shall be taken and deemed to be transferred to and vested int he(sic) Surviving Corporation upon the merger becoming effective withoutfurther deed or act, and the Surviving Corporation shall assume and from and after the effective time of the merger shall be responsible for all of the liabilities and obligations whatsoever nature. If at any time the Surviving Corporation shall deem or be advised that any further assignments, desirable to vest or confirm in the Surviving Corporation the title to any property or assets of MIDWEST, the officers and directors of MIDWEST (or the persons holding such positions immediately prior to the merger) shall and will do all acts and things to confirm such property and assets in the Surviving Corporation and otherwise to carry out the purposes of this Plan and Agreement." (Emphasis added).
 {¶ 44} It is clear from the language contained in the Individual Guaranty executed by Schindler, as well as the language in the merger agreement, that Audiovox is the designated successor and/or assign of Audiovox Midwest. The language in both documents is specific and leaves no room for the interpretation Hemsath suggests. Thus, Audiovox is entitled to enforce Schindler's guaranty as a matter of law. We conclude that no genuine issue of material fact exists with respect to whether Schindler's personal liability to Audiovox was terminated or modified in any way when Audiovox Midwest Corporation merged "with and into" Audiovox Corporation.
 {¶ 45} Hemsath's first assignment of error is overruled.
 III {¶ 46} Hemsath's second assignment is as follows:
 {¶ 47} "The trial court erred in granting summary judgment to samuel schindler against steve hemsath."
 {¶ 48} In his second assignment, Hemsath contends that the trial court erred when it held that no genuine issue existed as to whether he breached the express terms of the 1987 Purchase Agreement and Release he executed in favor of Schindler. Moreover, Hemsath argues that the trial court erred when it found that based on terms within the Purchase Agreement and Release, he was liable for the entire sum owed by Factory Direct and guaranteed by Schindler.
 {¶ 49} The Purchase Agreement provides in pertinent part: {¶ 50}
"Purchasers shall sign the necessary agreements to release Samuel K. Schindler from any all liabilities and shall hold Samuel K. Schindler harmless from date of closing. However, there shall be a stipulation with reference to any payable (including taxes) that was not included on the I-1987 statement. If any payable (including taxes) appear at a later date that were not shown on the January 1987 statement, Samuel K. Schindler shall be liable for any amount in excess of $7500.00.
 {¶ 51} "Purchasers shall accept all liabilities with all vendors at time of closing and shall obtain a release of liability from all vendorsfor Samuel K. Schindler within 60 days of closing." (Emphasis added).
 {¶ 52} The Release executed by the Hemsath and Tom Schindler provides that they "release Samuel K. Schindler from all claims and demands in any way connected with Dayton Comtec, Inc. [Factory Direct] or in any way arising out of its business or financial affairs." Moreover, the Release restates that Hemsath and Tom Schindler "shall obtain . . . within sixty (60) days from the date hereof a release of liability of Samuel K. Schindler to all vendors of Dayton Comtec, Inc." Hemsath does not dispute the fact that at no time did he obtain or attempt to obtain the release of Schindler contemplated by the above documents.
 {¶ 53} If a contract is clear and unambiguous, then its interpretation is a matter of law and there is no issue of fact to be determined. InlandRefuse Transfer Co. v. Browning-Ferris Industries of Ohio, Inc. (1984),15 Ohio St.3d 321, 322, 474 N.E.2d 271. However, where a term cannot be determined by reference to the four corners of the contract, factual determination of intent or reasonableness may be necessary to supply the missing term. Hallet Davis Piano Co. v. Starr Piano Co. (1911),85 Ohio St. 196, 97 N.E. 377. Thus, the initial determination as to whether additional evidence of intent is required is a question of law, not fact. A term is ambiguous when it is reasonably susceptible of two different interpretations. A term does not become ambiguous merely because it works a hardship on one party or works to the advantage of another. Aultman Hospital Assn. v. Community Mut. Ins. Co. (1989),46 Ohio St.3d 151.
 {¶ 54} By the express language of the Purchase Agreement and Release, Hemsath committed himself to procuring a release for Schindler from all vendor liability that he may have incurred during his time as the owner and principal shareholder of Factory Direct. The trial court found, and Hemsath does not dispute on appeal, that the Individual Guaranty executed by Schindler in 1985 falls under the purvey of "vendor liability" as it is used in the above documents. Thus, we agree with the trial court that Hemsath materially breached the clear and unequivocal terms of the Purchase Agreement and Release when he failed to secure a release for Schindler from the guaranty he executed in favor of Audiovox.
 {¶ 55} Having found that a breach occurred, it is now our duty to decide whether the obligation Hemsath has incurred with respect to Schindler's guaranty and Audiovox's subsequent claim is limited by the terms of the Purchase Agreement and Release to $7500.00 since the guaranty was not listed by Schindler as a payable on the January, 1987, financial statement. Hemsath contends that the Purchase Agreement and Release both clearly and unambiguously limit his responsibility to Schindler for any obligation not shown on the January, 1987, financial statement up to $7500.00 and not for the full amount claimed by Audiovox. We find Hemsath's argument in this reagrd to be unpersuasive.
 {¶ 56} "Payable" is defined as "capable of being paid; suitable to be paid; admitting or demanding payment. A sum of money is said to be payable when a person is under an obligation to pay it. . . . when used without qualification, [the] term normally means that the debt is payable at once, as opposed to `owing.'" Black's Law Dictionary, 5th Ed.
 {¶ 57} When the Purchase Agreement and Release were drafted in 1987, the Individual Guaranty was only an obligation to pay at some future date if Factory Direct became insolvent. To interpret the limiting clause to apply to a debt that was incurred twelve years later in 1999 would contradict the clear intent of the parties to hold harmless and "release Samuel K. Schindler from all claims and demands in any way connected with Dayton Comtec, Inc. [Factory Direct] or in any way arising out of its business or financial affairs." The guaranty executed by Schindler was not at issue, and thus, did not become a "payable" until 1999 when Factory Direct became insolvent. The fact that the Individual Guaranty was not listed on the 1987 financial statement is irrelevant. The express language of the Purchase Agreement and Release clearly indicates that Hemsath agreed to take responsibility for any future debts or "payables" that Factory Direct may incur, while absolving Schindler of any liability arising after January 1987.
 {¶ 58} With respect to the amount owed by Hemsath, the trial court found, and we agree, that had Hemsath obtained a release of Schindler's liability to Audiovox as required under the express terms of the Purchase Agreement and Release, Schindler would not be liable to Audiovox for the entire amount claimed. Neither document, however, contains a provision limiting Schindler's right to recover damages in the event of Hemsath's breach. We find, therefore, that Schindler is entitled to recover damages so as to place him in as good a position as he would have been had Hemsath fulfilled his contractual obligations under the Purchase Agreement and Release. Thus, Schindler is entitled to recover the full amount of the damages obtained by Audiovox against him based on the Individual Guaranty, namely $53,159.28, plus interest.
 {¶ 59} Hemsath's second assignment of error is overruled.
 IV {¶ 60} Hemsath's third and final assignment is as follows:
 {¶ 61} "The trial court erred in dismissing steve hemsath's third party complaint against larry walton."
 {¶ 62} In his final assignment of error, Hemsath contends that the trial court erred when it held that he was not entitled to indemnification from Walton in light of Walton's agreement to purchase Hemsath's shares of stock in Factory Direct. In support of this assertion, Hemsath highlights a portion of the Sales Agreement suggesting that Walton and the other purchasers of his stock agreed to indemnify him "against any and all liabilities, losses, damages, claims, suits, judgments, costs and expenses." Walton argues, however, that when the entire Sales Agreement is read in its entirety, it is clear that Walton and his partners did not intend to accept liability for the Guaranty originally executed by Schindler and reaffirmed by Hemsath. Walton contends that there is simply no evidence that Walton ever contracted to indemnify Hemsath for the debts of Schindler or Factory Direct. We agree.
 {¶ 63} Even a cursory review of the Sales Agreement demonstrates that Walton only agreed to indemnify Hemsath "against any and all liabilities, losses. . . . . . ." "arising out of or connected with (i) the enforcement of this agreement, or (ii) any failure on the part of any party hereto to perform or comply with any of the terms of this agreement." The Sales Agreement, unlike the Purchase Agreement and Release executed by Hemsath in favor of Schindler, does not contain broad language requiring Walton to indemnify Hemsath against any liability other than that associated with the enforcement of the Sales Agreement. Other than his bare assertion, Hemsath fails to offer any explanation as to how the Sales Agreement contractually obligates Walton to indemnify him with respect to the sums owed by Factory Direct and Schindler. Totally absent from Hemsath's brief is any explanation of the language limiting Walton's liability to situations "arising out of or connected with" the enforcement of the Sales Agreement.
 {¶ 64} Thus, this court agrees with the determination of the magistrate and the trial court that no genuine issue of material fact exists and that as a matter of law, Walton was not contractually obligated to indemnify Hemsath for the sums due Audiovox which Hemsath is now obligated to pay.
 {¶ 65} Hemsath's final assignment is hereby overruled.
 V {¶ 66} Schindler's sole assignment of error and all of Hemsath's assignments of error having been overruled, the judgment of the trial court is affirmed.
Brogan, P.J. and Fain, J., concur.