[Cite as *Abroms v. Synergy Bldg. Sys.*, 2011-Ohio-2180.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

HILLARD M. ABROMS, et al.　　　　　　:

　　　Plaintiffs-Appellants　　　　:　　　　C.A. CASE NO.　23944

v.　　　　　　　　　　　　　　　　:　　　　T.C. NO.　08CV311

SYNERGY BUILDING SYSTEMS, et al.　　:　　　　(Civil appeal from
　　　　　　　　　　　　　　　　　　　　　　　Common Pleas Court)
　　　Defendants-Appellees　　　　:

　　　　　　　　　　　　　　　　:

　　　　　　　　. . . . . . . . . .

**O P I N I O N**

Rendered on the ___6th___ day of ___May___ , 2011.

　　　　　　　　. . . . . . . . . .

HILLARD M. ABROMS, Atty. Reg. No. 0008552, 753 South Front Street, Columbus, Ohio 43206
　　　Attorney for Plaintiffs-Appellants

CHRISTOPHER F. JOHNSON, Atty. Reg. No. 0005240, 1 S. Main Street, Suite 1800, Dayton, Ohio 45402
　　　Attorney for Defendants-Appellees

　　　　　　　　. . . . . . . . . .

FROELICH, J.

{¶ 1} Hillard and Janet Abroms, dba Abroms Realty Company, appeal from a judgment of the Montgomery County Court of Common Pleas which granted summary judgment to Synergy Building Systems ("Synergy") and Jerad Barnett, Vice President of Synergy, on Counts Five and Six of the Abromses' complaint. For the followings reasons,

the trial court's judgment will be reversed and the matter will be remanded for further proceedings.

I

**{¶ 2}** On November 14, 2003, Hillard Abroms ("Abroms") executed a contract to purchase the commercial real estate located at 3025 Governors Place in Kettering, Ohio, from Synergy Development Ltd. for $1,350,000.[1] During negotiation of the agreement, the parties discussed problems with the building's windows, which had resulted in water leakage. Abroms had been made of aware of the water leakage in October 2003, when he visited the building with Roger Chudde, Branch Manager of A.G. Edwards and Sons, the building's sole tenant.

**{¶ 3}** In the contract, Abroms agreed to purchase the property "in its 'As-Is' condition, subject to all improvements ***." However, Paragraph Two of the agreement provided Abroms with a 15-day inspection period during which he could, at his option and expense, obtain inspections from qualified inspectors or contractors; Synergy agreed to have any repairs satisfactorily completed at its own cost up to $5,000. The paragraph further stated that "[t]he repairs referenced in this paragraph are in addition to those related to the windows as set forth in paragraph 4(D) below." Abroms did not have any inspections conducted.

**{¶ 4}** Paragraph Four set forth six contingencies upon which the sale of the

---

[1] Synergy Development Ltd. was not named in the complaint, and the relationship between Synergy Building Systems (the defendant) and Synergy Development Ltd. is unclear. Although Synergy Building Systems argued that the Abromses had sued the wrong company and that the court could dismiss Counts Five and Six on that basis alone, the trial court did not rule on that issue.

property was conditioned, which included:

**{¶ 5}**  "C.   The Seller shall provide the Buyer with an assignment of all continuing warranties relative to the building located on the Property (the 'Building').

**{¶ 6}**  "D.   The Seller shall provide to [Buyer] a certification stating that any repairs regarding the existing window leakage in the Building, including resealing of the windows, repair and replacement of the window sills, and wallpaper as required, will be completed by Seller in a timely manner."

**{¶ 7}**   If any of the contingencies were not satisfied by closing, both the buyer and the seller had the option to terminate the purchase contract.

**{¶ 8}**   Paragraph Ten addressed the remedies available to the parties upon default. Paragraph Twelve included an integration clause, indicating that the contract was a "complete agreement" and that "all prior oral and written discussions, negotiations, understandings and agreements between the parties have been incorporated or superseded by this document."   The parties agreed that the contract could only be assigned, modified, or amended in writing.

**{¶ 9}**   The parties closed on the purchase on December 30, 2003.

**{¶ 10}**  In 2006, Abroms became aware that mold had developed as a result of water leakage.  In the late summer of 2006, A.G. Edwards vacated the building due to the mold problem.

**{¶ 11}** In January 2008, the Abromses brought suit against Synergy, Barnett, and others (including Chudde), alleging breach of contract and various torts.  The Abromses alleged in their complaint that they learned after the discovery of the mold that, although the

water problem presented like a window issue, it was actually a brick and exterior insulation finishing system (EIFS) issue that caused water to seep from the areas by the windows. Synergy, in turn, filed a third-party complaint against Porter Contractors, with which Synergy had contracted to erect the building. Porter Contractors filed a fourth-party complaint against its subcontractors – Wallen Concept Glazing, Pudenz Masonry, and Synthetic Stucco.

{¶ 12} Sixteen of the Abromses' causes of action were directed against Synergy and Barnett. Of relevance to this appeal, Count Five, entitled "Breach of Contract (Synergy – Condition Subsequent)" alleged that Synergy breached the purchase contract by failing to correct the window leakage. Count Six, entitled "Breach of Contract (Synergy – Repair Work)," further alleged that "[a]ny and all attempts by Defendant Synergy to either repair and or replace the windows were negligently accomplished. ***"

{¶ 13} Through a series of decisions, the trial court resolved the causes of action with respect to each defendant, with the exception of Counts Five and Six of the complaint. On September 22, 2009, the trial court dismissed Roger Chudde as a defendant. In five separate decisions issued on December 28, 2009, the trial court granted summary judgment in favor of Reichley Insurance Agency, Inc.; Cincinnati Financial Corporation; Porter Contractors, Inc.; and Wallen Concept Glazing. The court also granted summary judgment to Synergy and Barnett on all of the Abromses claims against them, with the exception of Counts Five and Six, which were not addressed in Synergy and Barnett's motion and for which summary judgment had not been sought. The court certified each of the December 28, 2009, decisions as immediately appealable under Civ.R. 54(B). At the same time

(December 28), the court granted Chudde's motion for Civ.R. 54(B) certification of the September 22, 2009 judgment entry dismissing Chudde as a defendant.

{¶ 14} On January 5, 2010, the trial court entered an order vacating its determination that the decisions filed on December 28, 2009 were final and appealable. The order apparently resulted from the court's becoming aware during a telephone conference between all of the parties on January 4, 2010, that Counts Five and Six remained pending. The court's entry further ordered the Abromses, Synergy, and Barnett to address the following issue:

{¶ 15} "In the above listed *Decisions*, this Court has ruled the Plaintiffs are barred from recovery by their failure to mitigate damages; the Plaintiffs are unable to recover economic damages in tort; and the Plaintiffs, [who] are no longer owners of the building, lack standing to assert claims against Synergy and Barnett for property damage to the building. How, if at all, do any and all of these findings impact the Plaintiffs' remaining breach of contract claims under Counts 5 and 6 of the Complaint." (Emphasis in original.)

{¶ 16} In response to the trial court's order, Synergy and Barnett argued that, given the court's prior rulings, "Counts 5 and 6 no longer provide the plaintiffs with any mechanism for recovery." They contended that Count Six sounded in negligence and was therefore barred by the applicable statute of limitations. They further argued that Count Five was barred due to the Abromses' lack of standing and their failure to mitigate damages. The Abromses responded that genuine issues of material fact existed, that they mitigated their damages, and that they had standing as the property owners at the time of the breach. The Abromses argued that the "negligence of Defendants Synergy and Barnett for the repairs

was intrinsically related to the overriding Breach of Contract claim."

{¶ 17} On February 22, 2010, the trial court dismissed Counts Five and Six of the complaint and granted summary judgment to Synergy and Barnett on those claims. The court certified its judgment entry pursuant to Civ.R. 54(B). In separate entries, the trial court designated its previous decisions, the Civ.R. 54(B) certification for which had been vacated, as final and appealable orders.

{¶ 18} The Abromses filed notices of appeal on March 19, 2010 in Montgomery App. Nos. 23940, 23941, 23942, 23943, and 23944. We consolidated those cases for appeal. However, we subsequently dismissed the appeals in Montgomery App. Nos. 23940, 23941, 23942, and 23943 as untimely. We held that, once the trial court certified December 28, 2009, decisions under Civ.R. 54(B), it "was divested of its jurisdiction over the underlying matter with respect to [those] claims" and, consequently, "the court lacked jurisdiction over these orders to vacate each one's Civ.R. 54(B) certification on January 5, 2010."[2]

{¶ 19} The sole decision remaining on appeal is the February 22, 2010, decision granting judgment to Synergy and Barnett on Counts Five and Six.

II

{¶ 20} The Abromses raise five assignments of error, as follows:

{¶ 21} I. "TRIAL COURT ABUSED ITS DISCRETION AND EXCEEDED ITS

---

[2]Synergy and Barnett appealed from the trial court's summary judgment decision in favor of Porter Contractors (Montgomery App. No. 23951), and Porter Contractors appealed from the trial court's granting of summary judgment to Wallen Contract Glazing (Montgomery App. No. 23959). These appeals were also consolidated with the Abromses' appeals and dismissed as untimely.

AUTHORITY IN DENYING ABROMS DUE PROCESS OF THEIR CLAIMS."

{¶ 22} II.  "TRIAL COURT ABUSED ITS DISCRETION BY DECIDING CLEARLY DISPUTED ISSUES OF FACT DEPRIVING ABROMS THE ABILITY TO PROPERLY PLACE THEM BEFORE A JURY AS TRIER OF FACT."

{¶ 23} III.  "TRIAL COURT EXCEEDED, VIOLATED AND DEFEATED THE PURPOSE OF SUMMARY JUDGMENT BY SUSTAINING SYNERGY AND BARNETT'S MOTION FOR PARTIAL SUMMARY JUDGMENT DESPITE FAILING TO HEAR EVIDENCE AS WHETHER THERE WAS A WRITTEN CONTRACT BETWEEN THE PARTIES, WHETHER THE CONTRACT WAS BREACHED AND THE REMEDIES FOR THE BREACH OF CONTRACT."

{¶ 24} IV.  "THE TRIAL COURT COMMITTED PREJUDICIAL ERROR WHEN IT GRANTED SYNERGY AND BARNETT'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DISMISSED COUNTS 5 AND 6 OF ABROMS' COMPLAINT BY DECIDING ABROMS FAILED TO MITIGATE DAMAGES, AND IN SO DOING CONSTRUED EVIDENCE IN FAVOR OF SYNERGY AND BARNETT AND DECIDED ISSUES OF FACT WITHOUT A HEARING OR TRIAL."

{¶ 25} V. "TRIAL COURT'S DECISIONS, CONDUCT AND PRE-DISPOSITION WAS UNCONSCIONABLE, UNREASONABLE AND REACHED A JUDICIALLY IMPOSSIBLE CONCLUSION IN ITS DECISION DISMISSING COUNTS 5 AND 6 OF ABROMS' COMPLAINT BASED UPON SYNERGY AND BARNETT'S SUBMISSION AND ABROMS' RESPONSE."

{¶ 26} Before turning to the issues before us, we must address several threshold

matters.

{¶ 27} First, the Abromses' appellate brief was filed after the appeals were consolidated, but prior to the dismissal of the Abromses' four untimely appeals. Not surprisingly, the brief raises several issues that are no longer properly before us. Thus, to the extent that the Abromses' assignments of error address the trial court's prior summary judgment rulings, including its decision striking various portions of Abroms' affidavit, those portions of the assignments of error are overruled as moot.

{¶ 28} Second, Synergy and Barnett argue that the trial court's December 28, 2009, rulings constitute the law of the case and control the outcome of this appeal. The law of the case doctrine "holds that the decision of the reviewing court in a case remains the law of that case on the questions of law involved for all subsequent proceedings at the trial and appellate levels. *Nolan v. Nolan* (1984), 11 Ohio St.3d 1, ***." *Hardy v. Hardy*, Montgomery App. No. 22964, 2010-Ohio-561, ¶8. "The doctrine is necessary to ensure consistency of results in a case, to avoid endless litigation by settling the issues, and to preserve the structure of superior and inferior courts as designed by the Ohio Constitution." *Hopkins v. Dyer*, 104 Ohio St.3d 461, 2004-Ohio-6769, ¶15. It functions to compel trial courts to follow the mandates of reviewing courts. *Thatcher v. Sowards* (2001), 143 Ohio App.3d 137, 140-141. The law of the case doctrine is considered to be a rule of practice rather than a binding rule of substantive law; it will not be applied so as to achieve unjust results. *Hubbard ex rel. Creed v. Sauline*, 74 Ohio St.3d 402, 404, 1996-Ohio-174.

{¶ 29} The law of the case doctrine has been extended "to encompass a lower court's adherence to its own prior rulings or to the rulings of another judge or court in the same

case." *Olympic Title Ins. Co. v. Fifth Third Bank of Western Ohio*, Montgomery App. No. 20145, 2004-Ohio-4795, ¶19, quoting *Poluse v. Youngstown* (1999), 135 Ohio App.3d 720, 725. However, the doctrine does not mean that an appellate court is likewise bound by final orders of the trial court, in this case the December 28, 2009, decisions. To hold otherwise would place a trial court's rulings beyond the reach of appellate review.

{¶ 30} Although an appellate court is generally bound by its own prior rulings, our prior ruling was the entry dismissing the appeals from the December 28 decisions. This entry did not address any substantive issue decided by the trial court; we did not establish any law of the case. Accordingly, the law of the case doctrine is inapplicable to this appeal.

{¶ 31} Third, the Abromses argue that the trial judge should have recused himself due to a "conflict of interest." Specifically, they emphasize that the same trial judge presided over their declaratory judgment action against A.G. Edwards in *Abroms v. A.G. Edwards & Sons*, Montgomery C.P. No. 07 CV 1370. The Abromses did not seek recusal in the trial court and they have waived the issue for appeal. Further, absent even the suggestion of any facts or law by the Abromses, we do not understand what interests supposedly conflict. Perhaps they mean the judge was biased against them because he ruled in another case involving one or more of the same parties. However, the grounds of any such purported conflict or bias were known during this litigation and any bias was not even insinuated by the Abromses at the trial level; and, again, they do not present any facts or law to support their after-the-fact allegation of conflict/bias. Moreover, we find absolutely nothing in this record to indicate a conflict of interest or bias on the part of the trial court.

{¶ 32} Fourth, we note that the parties have not argued that Counts Five and Six are

barred due to the "As Is" provision in the purchase contract. Generally, under the doctrine of caveat emptor, a purchaser of real property cannot recover for a structural defect where (1) the defect is open to observation or discoverable on reasonable inspection, (2) the purchaser had an unimpeded opportunity to examine the property and (3) the vendor did not engage in fraud. *Layman v. Binns* (1988), 35 Ohio St.3d 176, 177. However, Count Five alleges breach of a separate and distinct term in the purchase contract which allegedly required Synergy to correct the window leakage. Count Six alleges, in essence, that Synergy breached the contract by performing repairs negligently. Neither claim falls within the "As Is" provision and, accordingly, neither is barred by that provision.

{¶ 33} Finally, the Abromses repeatedly argue that they were denied due process and "the ability to build a record at trial" due to the trial court's granting of summary judgment to Synergy and Barnett. They state that they should have been provided an opportunity to present evidence through documents and witnesses at trial.

{¶ 34} The concept of summary judgment is probably rooted in nineteenth century English practice. Bauman, The Evolution of the Summary Judgment Procedure (1956), 31 Ind. L.J. 329. Although its applicability to certain cases is debated, its constitutionality is beyond question. *Summers & Vargas Co. v. Abboud*, Cuyahoga App. No. 94310, 2010-Ohio-5595, ¶19; Gordillo, Summary Judgment and Problems in Applying the *Celotex* Trilogy Standard (1994), 42 Clev.St.L.Rev. 263. The purpose of a motion for summary judgment is to test whether genuine issues of material fact exist such that a trial is necessary to resolve those issues. Stated simply, if summary judgment were properly granted in accordance with Civ.R. 56, due process would not be violated by the failure to hold a trial on

the Abromses' claims.  *Summers & Vargas Co.* at ¶19.

{¶ 35} With respect to the February 22, 2010 decision, the essence of the Abromses' argument is that the trial court erred in dismissing Counts Five and Six and granting summary judgment to Synergy and Barnett on those claims.

{¶ 36} Summary judgment should be granted only if no genuine issue of material fact exists, the moving party is entitled to judgment as a matter of law, and reasonable minds can come to but one conclusion, which is adverse to the nonmoving party.  Civ.R. 56; *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 66.  An appellate court reviews summary judgments de novo, meaning that we review such judgments independently and without deference to the trial court's determinations.  *Koos v. Cent. Ohio Cellular, Inc.* (1994), 94 Ohio App.3d 579, 588.

{¶ 37} Upon a motion for summary judgment, the moving party bears the initial burden of showing that no genuine issue of material fact exists for trial.  *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 292-93.  Once the moving party satisfies its burden, the nonmoving party may not rest upon the mere allegations or denials of the party's pleadings. Id.; Civ.R. 56(E).  Rather, the burden then shifts to the non-moving party to respond, with affidavits or as otherwise permitted by Civ.R. 56, setting forth specific facts which show that there is a genuine issue of material fact for trial.  Id.  Throughout, the evidence must be construed in favor of the non-moving party.   Id.

III

{¶ 38} Count Five of the complaint, entitled "Breach of Contract (Synergy – Condition Subsequent)," alleged:

{¶ 39} "Pursuant to the Agreement of Sale, Defendant Synergy was contractually obligated to correct the window leakage on the Premises as promised in a timely manner, which they failed to do, resulting in failure of condition subsequent, which was a breach of the contract, and substantial economic damages to Plaintiffs."

{¶ 40} In granting judgment to Synergy and Barnett on this claim, the trial court made the following findings:

{¶ 41} "·Since the Plaintiffs lacks [sic] standing to pursue claims for property damage to the building, they cannot seek recovery against Synergy under Count 5, which alleges a claim [for] breach of contract.

{¶ 42} "·The Plaintiffs are precluded from *** recovery under Count 5 for failure to mitigate damages."

   *A.   Count Five – Standing*

{¶ 43} The trial court previously held in its decision granting partial summary judgment to Synergy and Barnett that the Abromses lacked standing to assert claims against those defendants for property damage to the building because they were no longer owners of the building. (Tr. Doc. #141.)  In so holding, the trial court adopted Porter Contractor's argument in its own summary judgment motion that the Abromses' ownership interest in the Governor's Place building had ceased when the property was sold at a sheriff's sale in a foreclosure action concerning that property and, thus, the Abromses lacked standing.  In essence, the trial court held that since the Abromses' property had been sold, they could not claim they would be directly benefitted or injured by this claim.

{¶ 44} "Standing is a preliminary inquiry that must be made before a court may

consider the merits of a legal claim. \*\*\* To have standing, a party must have a personal stake in the outcome of a legal controversy with an adversary. This holding is based upon the principle that 'it is the duty of every judicial tribunal to decide actual controversies between parties legitimately affected by specific facts and to render judgments which can be carried into effect. It has become settled judicial responsibility for courts to refrain from giving opinions on abstract propositions and to avoid the imposition by judgment of premature declarations or advice upon potential controversies.' *Fortner v. Thomas* (1970), 22 Ohio St.2d 13, 14, 51 O.O.2d 35, 257 N.E.2d 371.

{¶ 45} "An actual controversy is a genuine dispute between adverse parties. It is more than a disagreement; the parties must have adverse legal interests. \*\*\*" (Internal citations omitted) *Kincaid v. Erie Ins. Co.*, 128 Ohio St.3d 322, 2010-Ohio-6036, ¶9-10. We review the issue of standing de novo. Id. at ¶9.

{¶ 46} Common-law standing is similar to Civ.R. 17(A)'s real-party-in-interest requirement. The phrase "real party in interest" means "'one who has a real interest in the subject matter of the litigation, and not merely an interest in the action itself, i.e., one who is *directly* benefitted or injured by the outcome of the case.'" *Countrywide Home Loans, Inc. v. Swayne*, Greene App. No. 2009 CA 65, 2010-Ohio-3903, ¶28, quoting *Shealy v. Campbell* (1985), 20 Ohio St.3d 23, 24 (emphasis in original). Indeed, one who has standing by possessing a "personal stake" in a lawsuit undoubtedly also has a "real interest in the subject matter of the litigation." Thus, courts often conflate common-law standing and Civ.R. 17, treating them as one and the same. See, e.g., *State ex rel. Jones v. Suster*, 84 Ohio St.3d 70, 77, 1998-Ohio-275 ("Although a court may have subject matter jurisdiction over an action,

if a claim is asserted by one who is not the real party in interest, then the party lacks standing to prosecute the action."); *Sutton Funding, LLC v. Herres*, 188 Ohio App.3d 686, 2010-Ohio-3645, ¶38.

**{¶ 47}** In his deposition, Abroms acknowledged that a foreclosure action was filed concerning the Governor's Place building in May 2007. A judgment and decree of foreclosure was issued, and a sheriff's sale occurred in December 2007. The building was purchased by Park National Bank, the mortgagee.

**{¶ 48}** The Abromses' complaint in this case was filed on January 10, 2008. The court in the foreclosure case subsequently confirmed the sale of the Governor's Place property. Abroms acknowledged that the bank obtained a deficiency judgment and that a satisfaction of judgment was filed in June 2008.

**{¶ 49}** Under foreclosure law, mortgagors have an equitable right of redemption, which allows the mortgagor to pay the balance due and redeem the property. A homeowner's equity of redemption is foreclosed when a decree of foreclosure is issued, although courts typically provide a three-day grace period following the decree to exercise the equity of redemption. *Hausman v. Dayton*, 73 Ohio St.3d 671, 676, 1995-Ohio-277.

**{¶ 50}** Although the mortgagor's equity of redemption is foreclosed at the time that a judgment of foreclosure is entered, the General Assembly created a statutory right of redemption, which exists independently of the equitable right. R.C. 2329.33. Under this statutory right of redemption, at any time prior to the confirmation of the sale, a mortgagor "may redeem it from sale by depositing in the hands of the clerk of the court of common pleas to which such execution or order is returnable, the amount of the judgment or decree

upon which such lands were sold, with all costs, including poundage, and interest at the rate of eight per cent per annum on the purchase money from the day of sale to the time of such deposit, except where the judgment creditor is the purchaser, the interest at such rate on the excess above his claim." R.C. 2329.33. If a mortgagor exercises the statutory right of redemption prior to the confirmation of the sale, the court must set aside the sale, apply the deposit to the judgment, and award the interest to the purchaser. Id.

{¶ 51} After the sale has been confirmed and a deed is issued, title in the property relates back to the date of the sale. *Jashenosky v. Volrath* (1899), 59 Ohio St. 540. "Thus, title is considered to have been passed as of the date of the sale, not the date the sale was confirmed by the court. *** The rationale behind this rule is that the purchaser should have the benefits from the use of the property during this period since the purchaser cannot escape the sale, even though it has not yet been confirmed, interest is chargeable from the date of the sale on borrowed monies, and the purchaser would be liable for loss to the property during this period." *Hemmer v. Leigh* (Mar. 17, 1995), Erie App. No. E-94-052, citing *Jashenosky*, 59 Ohio St. at 545-46. The Supreme Court has held that, after confirmation of the sale, a purchaser is entitled to rents accruing between the date of the judicial sale and confirmation of the sale. *Jashenosky*, supra.

{¶ 52} However, a purchaser of foreclosed property has no vested right in the property until the sale is confirmed by the trial court. *Ohio Savings Bank v. Ambrose* (1990), 56 Ohio St.3d 53, syllabus. Indeed, "absent confirmation, a purchaser had no actionable interest by virtue of the successful bid alone." *State ex rel. Midwest Pride IV, Inc. v. Pontious* (1996), 75 Ohio St.3d 565, 568; see *Ambrose*, supra.

**{¶ 53}** In the present case, when the complaint was filed, the Governor's Place property had been sold at a sheriff's sale, but the sale had not been confirmed. Accordingly, at that time, the Abromses remained the owners of the property with a statutory right to redemption; Park National Bank, the lender-purchaser of the property, had no actionable interest in the property until (and unless) the sale was confirmed, since the Abromses could have exercised their statutory right of redemption. As a result, the Abromses had standing on January 10, 2008, to file an action for damages to the property.

**{¶ 54}** We appreciate the apparent paradox. The sellers (the Abromses) had standing when suit was brought on January 10 (that is, they claimed an actual injury to property to which they still had title and owned, since the sale had not been confirmed), but once the sale was confirmed and the deed issued to the buyers (Park National Bank), the title and ownership would relate back to the sale, thereby removing the interests of the Abromses and arguably retroactively eradicating their standing. However, the issue on this appeal is whether the trial court erred in finding there was no genuine issue of material fact that the Abromses did not have standing on February 22, 2010; that is, did they still have a personal stake in the outcome of the litigation.

**{¶ 55}** Count Five sought damages for breach of contract. The Abromses claimed that Synergy's breach of the purchase contract resulted in the loss of physical occupancy of the building and economic use of the building. (Doc. #159, p.2.) In discussing mitigation of damages, the Abromses explained that the breach of contract caused a loss of rental income due to the tenant's vacation of the building, a reduction in the property's value due to the mold, and the Abromses' loss of possession of the building due to their inability to

make mortgage payments (caused by the loss of rental income). Abroms' statements in his deposition that the property was sold at foreclosure and that the bank obtained a deficiency judgment indicates that Abroms' losses were not negated or recouped through the sale of the property. To the contrary, the evidence purports to indicate that, even after the sale of the building in the foreclosure action, the Abromses continued to have damages caused by Synergy and Barnett's alleged breach of the purchase contract. Indeed, one component of the Abromses' damages might be that Synergy's breach of contract adversely affected the foreclosure sale price. Synergy and Barnett have offered no evidence to the contrary. In other words, there is a genuine issue whether the Abromses continued to have a "personal stake" in their claims for breach of contract.

{¶ 56} The trial court erred in concluding that Count Five was, as a matter of law, barred for lack of standing.

B. *Count Five – Duty to Mitigate Damages*

{¶ 57} The trial court also granted judgment to Synergy and Barnett on the ground that the Abromses did not mitigate their damages.

{¶ 58} As a general rule, "an injured party has a duty to mitigate and may not recover for damages that could reasonably have been avoided." *Chicago Title Ins. Co. v. Huntington Natl. Bank*, 87 Ohio St.3d 270, 276, 1999-Ohio-62, citing *S & D Mechanical Contrs., Inc. v. Enting Water Conditioning Sys., Inc.* (1991), 71 Ohio App.3d 228. The injured party must use ordinary and reasonable effort to avoid or lessen the damages; such efforts may include a reasonable expenditure of money. See *Lucky Discount Lumber Co., Inc. v. Machine Tools of Am.*,181 Ohio App.3d 64, 2009-Ohio-534, ¶12 (citations omitted).

{¶ 59} The obligation to mitigate damages does not require the injured party to incur extraordinary expense and risk. *Chicago Title Ins. Co. v. Huntington Natl. Bank*, 87 Ohio St.3d 270, 276, 1999-Ohio-62, citing *S & D Mechanical Contrs., Inc. v. Enting Water Conditioning Sys., Inc.* (1991), 71 Ohio App.3d 228. The injured party need not do what is impracticable or unreasonable. *Lucky Discount Lumber* at ¶12. A risk will be considered extraordinary if the hazard it presents is substantially greater than would otherwise exist, due to some particular and unusual circumstance. Id. at ¶16.

{¶ 60} The failure to mitigate does not necessarily result in the plaintiff's non-recovery. *Kanistros v. Holeman*, Montgomery App. No. 20528, 2005-Ohio-660, ¶35, citing *AB & B, Inc. v. Banfi Products, Inc.* (1991), 71 Ohio App.3d 630; *Van Beusecum v. Continental Builders, Inc.*, Delaware App. No. 06CAE12-0095, 2008-Ohio-2141, ¶72. Rather, the defendant cannot be held responsible for those damages that a plaintiff could have avoided with reasonable effort and without undue risk or expense. Id. at ¶36.

{¶ 61} The defendant against whom the claim is made has the burden to demonstrate the injured plaintiff's failure to mitigate damages. Id. at ¶37.

{¶ 62} In arguing that Count Five was barred by the Abromses' failure to mitigate damages, Synergy and Barnett quoted Part G of Porter Contractor's motion for summary judgment, which the trial court had adopted in its December 28 decisions. That portion stated, in part:

{¶ 63} "Abroms testified at the second of his depositions that he had money and/or equity sufficient in the Governor's Square building to pay for the repairs suggested to the building, even after more extensive repairs and mold remediation were recommended. He

simply chose not to do them, hoping someone else would and he would not dig a 'deeper hole.' In other words, he simply abdicated his responsibility to mitigate any damages related to the building. He had the resources reasonably available to complete repairs as recommended, which would have, in turn, avoided the loss of his tenant and the subsequent loss of the building after the tenant's lease payments terminated and he did not pay the mortgage. The entirety of the damages now sought could and would have been avoided if Abroms had used the resources admittedly available to him and repaired the building and then simply filed suit, if he believed necessary, in a timely manner to recover those damages. He did not do any of that and is now therefore precluded from the recovery sought."

**{¶ 64}** In response to the trial court's show cause order (and on appeal), the Abromses argued that genuine issues of material fact existed as to whether they made reasonable efforts to mitigate their damages. They stated that they paid $72,000 for mold remediation. They emphasized that they had a second mortgage and loss of income due to the loss of their tenant.

**{¶ 65}** According to Abroms' affidavit, on November 3, 2006, Abroms hired a forensic architect to review the building plans and to write a report for Greater Dayton Construction Company, which was to be the general contractor for repairs and remediation. On November 6, 2006, ATC Associates began the mold remediation portion of the reconstruction project.

**{¶ 66}** In his deposition, Abroms testified that, in 2006, Park National Bank made $100,000 available to him to address the problems with the building; he used those funds to make mortgage payments to Park. (Dep. Vol. II at 49.) Abroms further testified that he

hired Dan Woody of ATC to remove the mold from the building. In his response to Porter Construction's request for interrogatories, which was attached as Exhibit H to Abroms' deposition, Abroms indicated that he ultimately paid $72,345.21 to ATC for interior mold remediation.

{¶ 67} Abroms further stated that he had hired Greater Dayton Construction to provide an estimate for repairing the building after the mold was removed. Abroms stated that he could not afford to hire Greater Dayton Construction to do all of the work proposed. Abroms believed that Greater Dayton Construction's actual work on the building was limited to removing a window and putting it back in place. (Id. at 116.) Abroms' response to interrogatories indicated that $7,305.50 was paid to Greater Dayton Construction. Abroms did not hire anyone else to perform work on the building. (Id.)

{¶ 68} During his deposition, Abroms was asked if he felt that he had enough equity in the building that, if he could access that equity through financing, he would have had the funds to pay for the repair of the building. Abroms responded affirmatively. (Dep. Vol. II at 54.) However, Abroms further testified that he could not obtain financing for his equity from another lender, considering the condition of the building and the mold (Id. at 53.) And, he testified that Park National "refused to give me money" that had been promised to repair the building; rather, the money would only assist Abroms in paying back the bank, i.e., the existing mortgage.

{¶ 69} Viewing the evidence in the light most favorable to Abroms, we find that genuine issues of material fact existed as to whether Abroms met his obligation to mitigate his damages. Abroms indicated that he had hired ATC to perform mold remediation, and

there was evidence that Abroms had paid over $72,000 for those services. Although there was evidence that Abroms could have accessed his equity in the building with another loan from Park National Bank, Abroms' testimony indicated that he could not use those funds for additional building remediation and that he lacked additional funds and sources of funds to conduct further repairs. Abroms' evidence, viewed in his favor, supported a conclusion that he took reasonable steps to mitigate damages. The trial court erred in granting judgment to Synergy and Barnett on Count Five for failure to mitigate damages.

{¶ 70} Abroms' assignment of error with respect to Count Five is sustained.

IV

{¶ 71} Count Six, entitled "Breach of Contract (Synergy – Repair Work), alleged:

{¶ 72} "Any and all attempts by Defendant Synergy to either repair and or replace the windows were negligently accomplished. The reference in the Purchase Agreement that the windows were causing the leakage was an oversimplification of a latent defect/construction defect as the water damage in part caused by the negligent design/placement of the brick around the windows for which Defendant Synergy was responsible as the builders of the premises. Defendant Synergy failed to provide Plaintiffs professional service and use high quality construction during their attempted repairs."

{¶ 73} The trial court granted judgment to Synergy and Barnett and dismissed Count Six, finding: "Count 6 of the Plaintiffs' Complaint sounds in negligence. Thus, it is barred by the four-year statute of limitations for causes of action based on negligence."

{¶ 74} Upon review of the complaint as a whole, we disagree with the trial court that the Abromses brought a tort action in Count Six. The Abromses described the contractual

relationship with Synergy as follows:

{¶ 75} "11.   In the Purchase Agreement described in Agreement of Sale, paragraph 5, Defendant Synergy was to fix the pre-existing window condition in a timely manner.   On both January 21 and January 24, 2004, claims were made with Cincinnati Insurance regarding such repairs, yet the repairs were never effectively completed and may have in fact exacerbated the already disastrous situation with the windows."

{¶ 76} The Abromses identified Count Six as a breach of contact claim, and they comment on the terms of the purchase agreement in that count.   Although the Abromses assert that Synergy engaged in negligence, the essence of Count Six is that Synergy breached the contractual requirement that it repair the leaking windows by performing such repairs negligently.   In short, Count Six is a breach of contract claim, not a tort claim.

{¶ 77} That Count Six was intended to be a contractual claim is further demonstrated by contrasting Count Six with the language used in Count Two, entitled "Negligent Repair (Synergy and Cincinnati Insurance)."   Count Two reads, in relevant part:

{¶ 78} "26.   On or about January 20, 2004 and January 24, 2004, Defendant Synergy failed to exercise the standard of care that a reasonably prudent person would have exercised in a similar situation and such conduct that fell below the legal standard established to protect others against unreasonable risk of harm by negligently repairing the defect.   Thus, the defective repairs to the windows caused further damage when Defendant Synergy plugged the weep holes, further not allowing for drainage of the water.   The aforementioned actions resulted in a willful disregard of the rights of the Plaintiffs as the owners of the premises."

{¶ 79} Stated simply, Count Two alleges that Synergy violated their standard of care and willfully disregarded the Abromses' rights when it negligently repaired the windows, whereas Count Six focuses on the purchase agreement and the negligent repair of the windows, which Synergy allegedly was contractually obligated to repair.

{¶ 80} We understand the trial court's difficulty in determining whether Count Six stated a contractual or tort claim. Unlike the breach of contract claim in Count Five, which expressly referenced Synergy's alleged contractual obligation to correct the window leakage, Count Six did not directly cite to a provision of the purchase agreement. Moreover, Count Six alleged negligence on Synergy's part. The inartfulness of the Abromses' pleading notwithstanding, based on the Abromses' identification of Count Six as a breach of contract claim and the reference to the window repair work required by the purchase agreement, we conclude that Count Six alleges a breach of contract claim (albeit probably redundant to Count Five).

{¶ 81} "[A] tort claim based upon the same actions as those upon which a breach-of-contract claim is based will exist independently of the contract action 'only if the breaching party also breaches a duty owed separately from that created by the contract, that is, a duty owed even if no contract existed.'" *425 Beecher, L.L.C. v. Unizan Bank, Natl. Assn.*, 186 Ohio App.3d 214, 2010-Ohio-412, ¶51, quoting *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.* (1996), 115 Ohio App.3d 137, 151. Allegations of negligence, recklessness, or intention do not "'serve to transmogrify a cause of action *ex contractu* into a tort.'" *Paramount Parks, Inc. v. Admiral Ins. Co.*, Warren App. No. CA2007-05-066, 2008-Ohio-1351, ¶6 (quoting the magistrate's decision in the underlying case). Here, the

Abromses claim that a duty imposed by the contract (to repair the window condition) was performed negligently; there was no independent duty imposed by law (ex delicto) to repair the damage, let alone to repair it non-negligently. Thus, to the extent that the Abromses were seeking relief both in contract and in tort for repairs that were required by the purchase agreement, the Abromses would be limited to contractual remedies.

{¶ 82} R.C. 2305.06 sets forth the statute of limitations for breach of a written contract. It provides: "Except as provided in sections 126.301 and 1302.98 of the Revised Code, an action upon a specialty or an agreement, contract, or promise in writing shall be brought within fifteen years after the cause thereof accrued." The Abromses' complaint was filed in 2008, well within that fifteen-year period. Accordingly, Count Six was not barred by the statute of limitations.

{¶ 83} The Abromses' assignment of error with respect to Count Six is sustained.

V

{¶ 84} The trial court's judgment will be reversed and the matter will be remanded for further proceedings.

. . . . . . . . . .

FAIN, J. and DONOVAN, J., concur.

Copies mailed to:

Hillard M. Abroms
Christopher F. Johnson
Hon. Dennis J. Langer