[Cite as *Lake v. Love*, 2017-Ohio-2714.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

| | | |
|---|---|---|
| MICHAEL L. LAKE, | : | |
| Plaintiff-Appellee, | : | CASE NO. CA2016-06-116 |
| - vs - | : | O P I N I O N<br>5/8/2017 |
| LEE C. LOVE, | : | |
| Defendant/Third-Party Plaintiff-<br>Appellant, | : | |
| | : | |
| - vs - | : | |
| | : | |
| MICHELLE LAKE, | : | |
| Third-Party Defendant-Appellee. | : | |
| | : | |

CIVIL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CV2014-05-1429

Michael and Michelle Lake, 5481 Liberty Woods Drive, Hamilton, Ohio 45011, plaintiff-appellee and third-party defendant-appellee, pro se

Fred Miller, Mark W. Raines, Baden & Jones Bldg., 246 High Street, Hamilton, Ohio 45011, for defendant-appellant

**HENDRICKSON, P.J.**

{¶ 1}  Defendant/third-party plaintiff-appellant, Lee C. Love, appeals from a judgment entered after a bench trial in the Butler County Court of Common Pleas in favor of plaintiff-

appellee, Michael L. Lake, and third-party defendant-appellee, Michelle Lake (collectively, "the Lakes") on claims of conversion made by Michael and by Love. For the reasons set forth below, we affirm the judgment of the trial court.

{¶ 2} Michelle and Michael are husband and wife. Michelle and Love are half-siblings, who share the same father. After Michelle's mother passed away in the mid-1990s, Love was put on the deed to the property that Michelle's mother and Michelle's and Love's father shared in Hamilton, Butler County, Ohio. This property contained a house and a large pole barn.

{¶ 3} In June 2003, Michelle and Love's father passed away, and the property passed to Love. At the time of his death, Michelle and Love's father was the only individual living in the home. Love, however, had personal items stored inside the pole barn on the property.

{¶ 4} Love and the Lakes reached an agreement wherein the Lakes would lease the home from Love with the goal of later purchasing the property. Love, with help from Michael, made some renovations to the home. Love spent around $15,000 to make the improvements. By January 2004, the Lakes moved into the home. The parties later entered into a written month-to-month lease for the property, which was backdated by the parties. The lease agreement did not provide Love with any right to occupy the property during the term of the lease. Nonetheless, Love believed he retained possession of the pole barn.

{¶ 5} Around July 2003, Love purchased a Craftsman lawn mower.[1] The Lakes claimed Love gifted the lawn mower to them and that they exclusively used the lawn mower

---

1. Michael testified Love used $1,500 he received from ABATE, a motorcycle organization that Love and Michelle's father belonged to prior to his death, to purchase the lawn mower. According to Michael, "ABATE gives out a $1500 policy for death benefits [and] * * * I guess [Love] got the $1500, and then used it to purchase the lawn tractor." Love, however, denied that he used money received from ABATE to purchase the lawn mower. Although he did not testify about the amount paid for the lawn mower, Love explained that he purchased the lawn mower with a credit card in July 2003.

- 2 -

to mow the property. Love acknowledged that the Lakes exclusively used the mower after they moved into the property's home, but he claimed he did not "give it to [them] to possess it."

{¶ 6} While the Lakes leased the property from Love, Love stored personal items in the pole barn, including a 1992 Rinker V260 boat and a 1996 Kawasaki jet ski. Then, in the winter of 2009, without any discussion with the Lakes, Love began to reside in his boat inside the pole barn. Love, with help from Michael, made certain improvements to the pole barn to make it habitable, including adding insulation, heating and air conditioning, and plumbing for the installation of a shower, sink, and toilet. In the summer of 2012, Love purchased a small, wooden storage shed and had it installed on the property so that the Lakes would have something to store their personal belongings in as Love was still residing in the pole barn.

{¶ 7} The Lakes purchased the property from Love near the end of April 2013. Less than a month later, in May 2013, the Lakes asked Love to pay $250 a month in rent for his use of the pole barn to defray the cost of the utilities he used. This request resulted in discord between the parties, and Michael ended up placing a note on Love's refrigerator asking him to vacate the property. Ultimately, the parties reached an agreement whereby Love would vacate the property but would be permitted to leave his personal items in the pole barn until he completed construction of a pole barn on another piece of property. The Lakes believed they had agreed to store Love's items for three months while the pole barn was being constructed, whereas Love believed the time-period to complete construction of his new pole barn while storing items in the Lakes' pole barn was open ended.

{¶ 8} Love vacated the Lakes' pole barn on June 6, 2013, leaving his boat, jet ski, furniture, tools, and other items behind. In August 2013, Love returned to the property and removed some items stored in the pole barn. Among the items removed by Love were tools and the Craftsman lawn mower. Love's boat and jet ski remained in the pole barn.

{¶ 9} The Lakes disputed that the items removed by Love belonged to him. The parties began quarreling over the ownership of the items Love removed. Love sent numerous disparaging text messages to Michelle and was eventually charged and convicted of telecommunications harassment in December 2014 in the Butler County Area II Court. Thereafter, communications between the parties occurred through their respective lawyers.

{¶ 10} In September or October 2014, the Lakes moved the items belonging to Love out of the pole barn and either into Love's boat or into the wooden storage shed so that they could begin using the pole barn. The Lakes then moved Love's boat and jet ski outside. The Lakes covered the boat and jet ski, but neither item was winterized. Love became aware that the boat and jet ski had been moved outdoors no later than November 17, 2014, when he came to the property to remove more of his belongings. This date marked the first big snowstorm of the season, and, due to the weather, the police officer supervising Love's removal of his belongings would not permit Love to drive his vehicle into the yard to hook up his boat. Additionally, the officer only allowed Love 25 to 30 minutes to collect his items, which was insufficient for Love to remove all of his items. Consequently, Love left his boat, jet ski, and other personal items behind.

{¶ 11} Love did not ask the Lakes if the boat and jet ski had been winterized; nor did he provide instructions on how to winterize the items. Rather, he assumed that the Lakes had properly winterized his boat and jet ski before moving them outside because he knew Michael had observed him winterize the boat and jet ski in prior years.

{¶ 12} Love returned to the property to collect his belongings in January 2015. At this time, he was able to remove his jet ski and the items stored in the wooden storage shed from the Lakes' property. However, Love was unable to remove the boat as the boat's trailer was frozen into the ground. Upon returning to the property in February 2015, Love was successful in retrieving his boat.

{¶ 13} Michael filed a complaint for conversion against Love in the Butler County Area II Court, Small Claims Division, seeking $3,000 in damages for the tools and lawn mower that Love took from him. Love filed a counterclaim against Michael and a third-party complaint against Michelle for claims of conversion of personal property and unjust enrichment, and he sought damages in excess of $25,000. As the amount of damages Love sought exceeded the jurisdictional amount of the Area II Court, the case was transferred to the Butler County Court of Common Pleas.

{¶ 14} On June 22, 2015, a bench trial was held before a magistrate. Michelle, Michael, and Love testified about the events that transpired between them from 2003 to 2015. With respect to his conversion claim, Michael testified that his Craftsman lawn mower, two ladders, and various tools he owned had been wrongfully taken by Love. Michael introduced Exhibit 5 into evidence which listed all items taken by Love, individually valued the items, and set forth an aggregate damage amount of $2,072.

{¶ 15} Love testified about various pieces of personal property that he owned that the Lakes damaged when they moved his items out of the insulated pole barn. He testified his boat and jet ski were no longer operable due to their exposure to the elements and that other personal items, which the Lakes moved out of the pole barn and placed outside in the boat or in the uninsulated wooden storage shed, had begun to mold and mildew.

{¶ 16} Love explained that he bought his boat in either 1997 or 1998 for $19,000, and he had gotten a good deal on the boat as it had a cracked motor. Love testified that after purchasing the boat, he completed several upgrades to the boat, including putting a new, $12,000 motor on the boat, reupholstering the seats, rebuilding the outdrive, putting new carpet on the decks, and installing a new hot water tank. According to Love, when he left the boat in the pole barn in June 2013, it was in "mint condition." However, when he was able to get the boat back in February 2015, it was significantly damaged. He sought $33,000 in

damages for the boat, and in support of his damage award, introduced an insurance policy indicating that the boat, with its trailer, was insured for $32,000.[2]

{¶ 17}   With respect to his 1996 Kawasaki jet ski, Love testified he bought the jet ski in 2009 for $4,400, and he maintained the jet ski in great condition.  However, after getting the jet ski back from the Lakes, the jet ski was "nothing but a water pump with an engine that drives it.  [Both] the engine and the pump are broken, cracked."  Love sought $5,000 in damages for the jet ski because "[t]hat's what [he has] invested in it.  The thing wasn't for sale and it wasn't – it wasn't to be ruined like it was ruined."

{¶ 18}   Finally, Love sought $15,000 in damages for harm caused to other items he had left behind in the pole barn.  He testified that a set of hardwood bedroom furniture, a leather living room set, and stereo equipment were damaged by the Lakes.

{¶ 19}   On December 3, 2015, the magistrate issued a decision recommending that judgment be entered in favor of Michael on his conversion claim in an amount of $2,072 and against Love on Love's counterclaim and third-party complaint.  In recommending that Love not be entitled to judgment, the magistrate specifically determined that the Lakes' testimony was more credible than Love's testimony.  The court found that any damages Love may have suffered resulted from his "unwillingness to mitigate his damages."  The magistrate stated:

> [Love] became aware of the fact that his items were removed from the pole barn and that his boat was sitting outside, not prepared for the winter.  Rather than working toward an amicable solution, he allowed the boat to sit out for the winter, with the assumption that it was winterized.  However, the Court finds that such an assumption was unfounded.  [Love] simply assumed that because Michael Lake had seen him winterize the boat in the past, he should have known the boat needed to be winterized.
>
> * * *

---

2. Love's insurance policy indicates his 1992 Rinker V260 boat, equipment, and motor was insured for $30,000. His 1994 Trailmaster trailer was insured for $2,000.

In this case, the Court finds that [Love's] damages stem solely from his unwillingness to mitigate his damages. He knew that [the Lakes] were unhappy with his behavior; he did not care. He knew that [the Lakes] wanted him to vacate their premises; he did not care. He knew that [the Lakes] wanted to use their pole barn; he did not care. Instead, he left his property on [the Lakes'] property for well over [a] year. And when he first went to retrieve property, shortly after leaving, rather than being kind, he made fun of Michelle Lake and purposefully took property he knew that he had given to [the Lakes], the lawn [mower]. That act then set forth a series of letters and discussions between the parties' lawyers that ultimately result[ed] in trial. When informed that his boat was being placed outside, rather than insuring that it had been properly winterized, [Love] continued to stress the "principle of the matter" and never took the opportunity to work through his lawyer to look in on the boat. In fact, he had already made any peaceful exchanges difficult, as he was convicted of telephone harassment.

{¶ 20} The magistrate further found that even if Love had demonstrated he was entitled to damages on his counterclaim and third-party complaint, "he provided no proof as to the actual amount of damages he suffered. * * * [Love's] figures were based on pure speculation." In discounting Love's testimony, the court noted that Love sought damages for more than the amount he originally paid for some items, including the jet ski.

{¶ 21} Love filed objections to the magistrate's decision, arguing that the magistrate erred in determining that Love failed to mitigate his damages and erred in calculating the amount of damages owed to Michael by including $1,500 in damages for the Craftsman lawn mower that Michael admitted he had not purchased. Love contended that including the $1,500 in the damage award "unjustly enriched [Michael] for the value of personal property that was never his."

{¶ 22} On May 17, 2016, the trial court overruled Love's objections and adopted the magistrate's decision. The trial court specifically found that it was Love's "own behavior and hostility that impeded his ability to retrieve his property and mitigate his damages. * * * [T]he Magistrate had sufficient evidence to base his decision that [Love] failed to mitigate his

damages, and, as such, is not entitled to any damages." The court further determined there was "sufficient evidence to find that the lawn [mower] was actually a gift to the Lakes for which they are entitled to compensation for [Love's] taking of the lawn [mower]."

{¶ 23} Love appealed the trial court's decision, raising three assignments of error. For ease of discussion, we will address Love's second and third assignments of error together.

{¶ 24} Assignment of Error No. 1:

{¶ 25} THE TRIAL COURT ERRED TO THE PREJUDICE OF [LOVE] WHEN IT HELD THAT HE HAD FAILED TO MITIGATE HIS DAMAGES.

{¶ 26} In his first assignment of error, Love argues the trial court erred when it determined he failed to mitigate his damages. Love contends he did not have a duty to mitigate as the record demonstrates he was not aware his property was in jeopardy of being damaged by the Lakes until after it had been removed from the pole barn, suffered damages, and it "was too late for him to do anything about it."

{¶ 27} "[A]n injured party has a duty to mitigate and may not recover for damages that could reasonably have been avoided." *Chicago Title Ins. Co. v. Huntington Natl. Bank*, 87 Ohio St.3d 270, 276 (1999). This duty arises where the injured party has knowledge that damages have been sustained. *Baird v. Crop Prod. Servs.*, 12th Dist. Fayette Nos. CA2011-03-003 and CA2011-04-005, 2012-Ohio-4022, ¶ 37. "In mitigating damages, an injured party must use only ordinary and reasonable effort to avoid or lessen the damages." *Id.* at ¶ 44, citing *Abroms v. Synergy Bldg. Sys.*, 2d Dist. Montgomery No. 23944, 2011-Ohio-2180, ¶ 58. The injured party does not need to do what is unreasonable or impracticable or what is expected to result in extraordinary expenses. *Id.*, citing *Chicago Title Ins. Co.* at 296. Because failure to mitigate is an affirmative defense, the burden to prove it lies with the party raising it. *Id.* at ¶ 43.

{¶ 28} Having reviewed the record in the present case, we find that the evidence supports the trial court's conclusion that Love failed to mitigate his damages. Contrary to Love's contentions the record demonstrates that he could have used ordinary and reasonable efforts to prevent, or at least substantially lessen, any damage to his belongings. There is no evidence in the record to support Love's claim that the boat and jet ski had already sustained damage as of November 17, 2014, the date he discovered the watercrafts sitting outside the pole barn. In fact, trial testimony indicated that November 17, 2014, was the date of the first snowstorm of the season. Love could have acted on this date to prevent damage to his belongings. Although he was not permitted by law enforcement to drive into the Lakes' yard to attach the boat to a vehicle, there is nothing in the record indicating he was prevented from taking steps to winterize the watercrafts that day. Likewise, there was nothing in the record demonstrating he was prevented from contacting the Lakes through his attorney to find out if his boat and jet ski had been winterized, to arrange for the watercrafts to be winterized, or to provide instructions on how to winterize the watercrafts.

{¶ 29} Love contends his ability to remove his personal property from the Lakes' property was hindered by a court order that required either a member of law enforcement or both parties' attorneys to be present before he could remove his property. However, as the trial court noted, it was Love's "own behavior and hostility that impeded his ability to retrieve his property and mitigate his damages." Had Love not taken property that did not belong to him in August 2013, sent disparaging text messages to Michelle, and been convicted of telecommunications harassment, he would not have been prevented from obtaining his property without supervision. There is no evidence in the record indicating that the delay in Love picking up his belongings was due to obstruction by the Lakes. Rather, the evidence introduced at trial indicated the delay was caused solely by Love's conduct.

{¶ 30} Accordingly, as the weight of the evidence introduced at trial demonstrated

Love delayed more than 17 months in retrieving his items from the Lakes' property, that his delay was a result of his own actions and not those of the Lakes, and that he did not take any action to prevent damage to his belongings after learning they had been removed from the pole barn, we find no error in the trial court's determination that Love failed to mitigate his damages.

{¶ 31} Love's first assignment of error is overruled.

{¶ 32} Assignment of Error No. 2:

{¶ 33} THE TRIAL COURT ERRED TO THE PREJUDICE OF [LOVE] WHEN IT RULED THAT HE HAD NOT PROVED HIS ENTITLEMENT TO DAMAGES BY A PREPONDERANCE OF THE EVIDENCE.

{¶ 34} Assignment of Error No. 3:

{¶ 35} THE TRIAL COURT ERRED IN ISSUING A JUDGMENT FOR $2,072.00 AGAINST [LOVE] AS [MICHAEL LAKE] FAILED TO PRODUCE EVIDENCE OF THE VALUE OF THE PROPERTY AT ISSUE.

{¶ 36} In his second assignment of error, Love argues the trial court erred in concluding that he was not entitled to damages because his requested damage figures are "based on pure speculation." In his third assignment of error, Love argues the trial court erred in awarding $2,072 in damages to Michael as the damage award is "speculative" and is not based on the value of the property at the time the conversion took place.

{¶ 37} With respect to the arguments raised in Love's second and third assignments of error, we note that Love failed to raise these specific arguments within his objections to the magistrate's decision. "An objection to a magistrate's decision shall be specific and state with particularity all grounds for objection." Civ.R. 53(D)(3)(b)(ii). Where a party has failed to object to a factual finding or legal conclusion in accordance with Civ.R. 53(D)(3)(b), "[e]xcept for a claim of plain error, a party shall not assign as error on appeal the court's adoption of

any factual finding or legal conclusion, whether or not specifically designated a finding of fact or conclusion of law[.]" Civ.R. 53(D)(3)(b)(iv). "[E]ven then, 'unless the appellant argues a claim of plain error, the appellant has waived the claimed errors not objected to below.'" *Levy v. Seiber*, 12th Dist. Butler Nos. CA2015-02-019, CA2015-02-021, and CA2015-02-030, 2016-Ohio-68, ¶ 61, quoting *In re L.K.*, 12th Dist. Butler No. CA2014-06-145, 2015-Ohio-1091, ¶ 16.

{¶ 38} Here, Love only objected to the magistrate's determinations that he failed to mitigate his damages and that the value of the lawn mower could be included in Michael's damage award when the mower "was never his" as Michael failed to purchase or pay anything for the mower. Love did not object to the magistrate's conclusion that he provided no proof as to the actual amount of damages he suffered or that the damage figures he provided were based on "pure speculation." Likewise, Love did not object to the amount of damages awarded to Michael on the basis that there was insufficient proof of the fair market value of the property at the time of conversion. As Love did not specifically object to the magistrate's decision on these bases, and he has not set forth a claim of plain error, he has forfeited review of these issues on appeal. *See Levy* at ¶ 61; *Washington Mut. Bank, F.A. v. Wallace*, 12th Dist. Warren No. CA2016-05-037, 2016-Ohio-7992, ¶ 13.

{¶ 39} Further, even if this court were to review Love's assigned errors under a plain error standard, Love does not prevail. Civil plain error is an extremely deferential standard of review and its application is limited to "those extremely rare cases where exceptional circumstances require its application to prevent a manifest miscarriage of justice, and where the error complained of, if left uncorrected, would have a material adverse effect on the character of, and public confidence in, judicial proceedings." *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 121 (1997), citing *Schade v. Carnegie Body Co.*, 70 Ohio St.2d 207, 209 (1982). This is not one of those "extremely rare cases" presenting "exceptional circumstances" where

application of civil plain error is appropriate. Here, the trial court was presented with testimony and evidence from the Lakes and Love regarding the damages each party was alleged to have sustained. The trial court found the Lakes' testimony and evidence credible but found Love's damage figures were speculative, as evidenced by the fact that he was seeking more in damages than he original paid for his 1992 Rinker V260 boat and a 1996 Kawasaki jet ski. The trial court was entitled to discredit Love's testimony that he kept his boat and jet ski in "mint condition" and had made thousands of dollars of improvements to increase the value of his items. The circumstances of the present case, therefore, do not support a finding of plain error.

{¶ 40} Accordingly, for the reasons set forth above, Love's second and third assignments of error are overruled.

{¶ 41} Judgment affirmed.

PIPER and M. POWELL, JJ., concur.